594

PACKAGE AND UTILITY DRIVERS, LOCAL NO. 396, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Plaintiff,

v.

HEARST PUBLISHING COMPANY, Inc., a Delaware corporation, Defendant.

No. 62–328–K.

United States District Court
S. D. California,
Central Division.

July 6, 1962.

Brundage, Hackler & Roseman, Los Angeles, Cal., for plaintiff.

Flint & MacKay, by Edward L. Compton, Los Angeles, Cal., for defendant.

JAMES M. CARTER, District Judge.

This is an action by the Package and Utility Drivers, Local No. 396, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, (hereinafter called Teamsters) to compel Hearst Publishing Company, Inc., (hereinafter called Company) to submit to arbitration under Title 29 U.S.C.A. § 185 [61 Stat. 156] (hereinafter called section 301).

Two questions are presented: (1) whether or not the Company is required to submit to arbitration, and (2) what effect an unfair labor practice has on the arbitrability of a certain case.

The Hearst Publishing Company operated two newspapers in Los Angeles, The Examiner and the Herald Express. Employees who delivered the Examiner were members of the Teamsters. Employees who delivered the Herald Express were members of the Guild.

On January 7, 1962, the Examiner discontinued operations. The members of

the Teamsters then employed by the Examiner received all monies due and owing them from the employer, which is conceded to be Hearst Publishing Company.

On February 25, 1962, the Herald Express hired additional employees to deliver said newspaper. 152 new employees were hired; and 67 of this number were former Teamster members employed by the Examiner. The Teamster Union on January 19, 1962, wrote the Hearst Publishing Company, and as a result of the discontinuance of the Examiner, requested arbitration under section 11 [1] of the collective bargaining agreement, of the following issues:

(1) the right of the Company to terminate any of the employees of the Examiner;

(2) the failure of the Company to apply the provisions of the collective bargaining agreement in retaining certain employees;

(3) the failure of the Company to apply the provisions of the collective bargaining agreement to those employees who were retained; and

(4) what remedy is appropriate if an arbitrator decides that there has been a breach of the collective bargaining agreement.

On February 1, 1962, the Company replied, contending that the discontinuance of the Examiner, in effect, voided the collective bargaining agreement.

On February 8, 1962, the Teamsters filed a charge against the Company before the NLRB.[2]

The Teamsters, as plaintiff, filed this action to compel arbitration under the collective bargaining agreement on February 21, 1962.

The Company filed a motion for summary judgment on March 22, 1962, contending that: (1) an employer has an absolute right to go out of business; (2) the discontinuance of the Examiner and discharge of its employees, does not give rise to any arbitrable issue; (3) by filing a charge with the NLRB the Teamsters have foreclosed the route of arbitration; and no arbitration award is binding on the NLRB; and (4) the matters which the Teamsters contend should be arbitrated are within the exclusive jurisdiction of the NLRB.

The Teamsters moved for summary judgment on April 6, 1962, and contended that:

(1) Hearst Publishing Company is the employer;

(2) the collective bargaining agreement is in full force and effect;

(3) federal law governs the rights of the parties;

(4) federal law dictates that the district court cannot weigh the merits of the contentions; and

(5) the filing of an unfair labor practice does not bar the district court from issuing an order compelling arbitration.

The motions for summary judgment were heard on April 16, 1962. The following important stipulations were agreed on: (1) That there was no dispute of fact in the record and that the court could rule on the motions for summary judgment or it could decide the case on its merits, [Reporter's transcript, pp. 31, 69]; (2) Hearst Publishing Company is the employer [Reporter's transcript, pp. 4–6]; (3) The real issue to be decided is whether or not the Teamster

1. "Section 11. *Settlement of Controversies.* Both parties hereto further recognize and agree that industrial peace is to be desired at all times in the area covered by this Agreement, and to that end it is agreed: (a) Should a controversy, dispute or disagreement arise during the period of this Agreement, there shall be no cessation or stoppage of work authorized by the Union, and the Union will do its utmost to see that work is continued in a normal and orderly way, and said controversy, dispute or disagreement shall be adjusted in the following manner: * * * ".

2. The NLRB refused to issue a complaint against the Company for violating sections 8(a) (3) and 8(a) (5) but there is pending a complaint against the Company under section 8(a) (1), 29 U.S.C.A. § 158.

members who were formerly employed by the Examiner, when hired by the Herald Express, had to be hired on the basis of seniority and according to the collective bargaining agreement between the Examiner and the Teamsters [Reporter's transcript, pp. 8, 9, 10, 37–39].

## I.

### IS THE HEARST PUBLISHING COMPANY REQUIRED TO SUBMIT TO ARBITRATION

This case presents a unique problem concerning the interpretation of recent Supreme Court decisions.

The Teamsters have properly filed this action under section 301 (29 U.S.C.A. 185), and are in effect requesting specific performance of a contract.

There is no doubt that a Company has the right to go out of business for economic reasons.[3] However, the arbitration problem stands separate and apart from the right of a Company to go out of business.

(a) *Development of the case law*

In the case of International Association of Machinists v. Cutler-Hammer, Inc., [N.Y.Sup.Ct.1947] 271 App.Div. 917, 67 N.Y.S.2d 317, aff'd without opinion 297 N.Y. 519, 74 N.E.2d 464, it was held that: "It is for the Court to determine whether the contract contains a provision for arbitration of the dispute tendered, and in the exercise of that jurisdiction the Court must determine whether there is such a dispute."

This holding resulted in the Cutler-Hammer doctrine which allowed the courts to pass on the merits of a grievance under the guise of determining its arbitrability.

The case of Textile Workers Union of America v. Lincoln Mills [1957] 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, was the first important decision involving a request for specific performance of an arbitration agreement under section 301

[29 U.S.C.A. 185]. The Supreme Court stated that:

(1) Section 301(a) is more than jurisdictional and that it authorizes federal courts to fashion a body of federal law for the enforcement of these collective agreements;

(2) Section 301(b) states the procedural methodology whereby such suit may be brought;

(3) the philosophy behind Section 301 is founded upon promoting a higher degree of responsibility between labor and management and thus promoting industrial peace;

(4) Specific performance (which is in effect a mandatory injunction) is not precluded by Section 7 of the Norris-LaGuardia Act [29 U.S.C.A. § 107]; and

(5) There is an indication that the *quid pro quo* for an agreement by management to arbitrate grievance disputes is a no-strike agreement by the union.

The crucial cases in the arbitration area, known as the "trilogy," were decided in 1960.

In the first case, United Steelworkers v. American Mfg. Co., (1960) 363 U.S. 564, 80 S.Ct. 1343, 1363, 4 L.Ed.2d 1432, the union asked for arbitration of a grievance that one of its members had with the company. The union member had been injured and subsequently had received a workmen's compensation award. Subsequent to this award the union member requested that he be returned to work, based on the seniority provisions of the collective bargaining agreement. The Company refused to arbitrate this grievance.

The Supreme Court first disapproved the Cutler-Hammer doctrine and then said:

"Yet, the agreement is to submit all grievances to arbitration, not merely those that a court may deem

---

3. See: Jay Foods Inc., v. N. L. R. B. [7 Cir. 1961] 292 F.2d 317, 320; N. L. R. B. v. Lassing [6 Cir. 1960] 284 F.2d 781, 783; and N. L. R. B. v. Adkins Transfer Co., [6 Cir. 1955] 226 F.2d 324, 327.

to be meritorious. There is no exception in the 'no strike' clause and none therefore should be read into the grievance clause, since one is the *quid pro quo* for the other. The question is not whether in the mind of the court there is equity in the claim. Arbitration is a stabilizing influence only as it serves as a vehicle for handling any and all disputes that arise under the agreement." (363 U.S. p. 567, 80 S.Ct. p. 1346).

"The collective agreement calls for the submission of grievances in the categories which it describes, irrespective of whether a court may deem them to be meritorious. In our role of developing a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements, we think special heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve. * * * The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. *It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.* Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." (363 U.S. pp. 567, 568, 80 S.Ct. p. 1346). [Emphasis added.]

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware." (p. 568, 80 S.Ct. p. 1346).

"The union claimed in this case that the company had violated a specific provision of the contract. The company took the position that it had not violated that clause. There was, therefore, a dispute between the parties as to '*the meaning, interpretation and application*' of the collective bargaining agreement." (p. 569, 80 S.Ct. p. 1346). [Emphasis added].

In Steelworkers v. Warrior & Gulf Co., [1960] 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, the second case in the "trilogy," the Supreme Court was faced with the following facts: The Company transported steel and steel products by barge and maintained a terminal at Chickasaw, Alabama, where it performs maintenance and repair work on the barges. The employees were represented by the Steelworkers union.

Between 1956 and 1958 the Company laid off some employees reducing the bargaining unit from 42 to 23 men. This reduction was partially due to the Company contracting maintenance work to other independent companies. These independent companies hired some of the laid-off employees at reduced wages.

A grievance was filed with the Company based on the previously stated facts. The grievance was not satisfied; the union requested arbitration; and when the company refused arbitration the union brought suit for specific performance. The lower court dismissed, essentially on the ground that this was a "function of management," and thus not subject to arbitration.

The Supreme Court reversed and in effect ordered arbitration. The Court stated that:

"Here arbitration is the substitute for industrial strife. Since arbitra-

tion of labor disputes has quite different functions from arbitration under an ordinary commercial agreement, the hostility evinced by courts toward arbitration of commercial agreements has no place here. For arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself.

"The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate. * * * The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." (363 U.S. pp. 578, 579, 80 S.Ct. p. 1350).

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." (pp. 582, 583, 80 S.Ct. p. 1353).

"When, however, an absolute no-strike clause is included in the agreement, then in a very real sense *everything that management does is subject to the agreement,* for either management is prohibited or limited in the action it takes, or if not, it is protected from interference by strikes." (p. 583, 80 S.Ct. p. 1353).

"Accordingly, 'strictly a function of management' must be interpreted as referring *only* to that over which the contract gives management complete control and unfettered discretion." (p. 584, 80 S.Ct. p. 1353).

"The grievance alleged that the the contracting out was a violation of the collective bargaining agreement. There was, therefore, a dispute 'as to the meaning and applica-

tion of the provisions of this Agreement' which the parties had agreed would be determined by arbitration." (p. 585, 80 S.Ct. p. 1354). [Emphasis added.]

In the final case in the "trilogy", Steelworkers v. Enterprise Corp., [1960] 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424, the facts were as follows: Employees were discharged for a wildcat strike. After the discharge and before the arbitration award the collective agreement expired. The arbitration award said that a discharge was not proper and that the proper discipline would have been a ten day suspension. The arbitrator awarded the employees pay for all of the time that they had been discharged subtracting therefrom the ten day suspension period. The District Court ordered the employer to comply with the award.

The Court of Appeals held that the reinstatement and all pay subsequent to the termination of the collective agreement was unenforceable.

The Supreme Court approved the action of the District Court (and thus the arbitrator) and said:

"The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." (p. 596, 80 S.Ct. p. 1360).

Thus, the Supreme Court, in the previously discussed cases, has indicated: that the Cutler-Hammer doctrine is dead; a suit for specific performance under section 301 may be brought in the District Courts: Federal procedural and substantive law will control such a suit; the "no-strike" clause is the *quid pro quo* for the agreement of management to arbitrate; the District Courts may not consider the merits of the grievance; the District Courts should resolve all doubts in favor of arbitration; the

management contention of "strictly a function of management" will be allowed only when there is a specific exclusion in the agreement by management (it is to be noted that this conclusion assumes a "no-strike" clause in the agreement); and the philosophy behind the Supreme Court granting specific performance of an agreement to arbitrate is based on the arbitrators knowledge of the particular industry and also on the overall aim of industrial peace.

In Portland Web Pressmen's Union v. Oregonian Pub. Co., [9 Cir.1960] 286 F.2d 4, certiorari denied 366 U.S. 912, 81 S.Ct. 1086, 6 L.Ed.2d 237, the court was faced with the following fact situation: Company gave notice of termination of its agreement with union one. The agreement was to expire on December 31, 1959. In November another union went on strike against the Company. The members of union one refused to cross the picket line. This refusal continued until union one went on strike on January 2, 1960.

On December 27, 1959, union one wrote the Company requesting that a new collective agreement be reached. The Company replied on December 28, 1959, and stated that union one had breached its no-strike agreement and thus its members were no longer employees. Union one then replied, on the same day, indicating that the matter of whether or not its members were still employees should follow the grievance procedure route.

Subsequently the union requested that the District Court order that the dispute be arbitrated. The District Court dismissed the complaint.

The Court of Appeals affirmed, and held: (1) that there was no justiciable controversy in that the contract had terminated on December 31, 1959, and there were no serious contract questions, (2) the NLRB is the proper party to determine whether or not the union still represents a majority of the employees. The Court also indicated that if there was an unfair labor practice the NLRB has exclusive jurisdiction, absent a substantial contract violation:

"We believe that where the question between the parties is whether one or the other has been guilty of an unfair labor practice *and there are no substantial contract violations involved (and we have found none here) that the exclusive jurisdiction for the settlement of such a dispute should rest with the N. L. R. B."* (286 F.2d p. 10). [Emphasis added].

In distinguishing the "trilogy" the Court stated:

"We do not think that any of these three is in point. In each case the facts showed that the union contended that its members had suffered substantial grievances during the time that the contracts were in effect. In each, if the arbitrator had found that the action of the employer was wrongful, the individual members of the union who were affected by the wrongful action would have been entitled to some compensation. The rights of these individual members were vested in them during the period covered by the contract. As we have pointed out, such facts are not present in this case. The only complaint that the Pressmen make is that the Publishers refused to engage in collective bargaining with it as the representative of its members. There is no claim made that any of the union members would be entitled to any substantial redress even if the arbitrator decided every issue that was submitted to him in favor of the Pressmen. Settlement of this dispute can only be had by resort to the N. L. R. B. To hold otherwise would be to hold that by a collective bargaining contract the parties are able to take disputes that Congress has consigned to the exclusive jurisdiction of the N. L. R. B. out of the hands of the N. L. R. B. and put them in the hands of a private arbitrator." (286 F.2d pp. 10, 11).

The Pressmen's case is distinguishable from our fact situation. Our case, as will be indicated in the next section, does involve substantial contract rights. Next, our contract has never been terminated by the Company.

It is concluded at this point in our analysis that the "trilogy" is the controlling case law as far as our problem is concerned.

### (b) *Application of the case law*

The arbitration clause (presented in note one) is a broad arbitration clause. It is to be noted that there is a "no-strike" section in the clause. Thus the requirement (if it is a requirement) of the "trilogy" of a "no-strike" clause serving as the *quid pro quo* for management's agreement to arbitrate is met.

At this point we must consider the contentions of the Teamsters and determine whether or not the "trilogy" and their rules would compel arbitration.

(1) The Teamsters first contended that whether or not the Company has the right to terminate employees is in itself subject to arbitration.

It may be argued that the Company has the right to go out of business and of course this is apart from the collective bargaining agreement.

But, the methodology used, the payments to be made, and other collateral considerations, would clearly be arbitrable under the agreement.

(2) Next the Teamsters alleged that the Company discriminated. Whether or not the union can show discrimination is of no consequence. As long as it would come within the contract it is an arbitrable issue. There is no doubt that discrimination would come within the contract.

(3) The union contends that the Company failed to apply the provisions of the agreement in retaining employees.

It may be argued that the employees were not retained but new hires had been made. However, such a problem would clearly come within the seniority provisions of the collective bargaining agreement.

(4) The union alleges that the employees who were retained should have been retained as per the provisions of the collective agreement. Again it would appear that this would be an arbitrable issue.

The foregoing factual analysis is made in light of the fact that the Teamsters claimed that the Company had violated specific provisions of the contract. The Company took the position that it had not violated the contract. There was, therefore, a dispute between the parties as to "the meaning, interpretation and application" of the contract.

### II.

### DOES THE FACT THAT THERE MAY BE AN UNFAIR LABOR PRACTICE AFFECT THE ARBITRABILITY OF THIS CASE?

The Teamsters have filed a charge with the NLRB contending that the action of the company amounted to an unfair labor practice.

The Company takes the position that as a result of this filing the NLRB has exclusive jurisdiction. There is a line of authority which would indicate that when the controversy involves an unfair labor practice the NLRB has exclusive jurisdiction.[4]

In Lodge No. 12 etc. v. Cameron Iron Works, [5 Cir.1958] 257 F.2d 467, it was held, in a well reasoned opinion, that parties to a collective agreement may contract to submit matters which may be an unfair labor practice to arbitration. The Court said:

"If an arbitrable contract violation encompasses an unfair labor

---

4. International Chem. Wkrs. U. v. Olin Matheson Chem. Corp., [D.C.S.D.Ill.1962] 202 F.Supp. 363; and Local 1357, Retail Clerks Int. Ass'n. v. Food Fair Stores, Inc., [D.C.E.D.Pa.1961] 202 F.Supp. 322.

But compare: Local Lodge 1836 v. Raytheon Mfg. Co., [D.C.Mass.1962] 201 F. Supp. 334; and Freight Drivers v. Quinn Freight Lines, [D.C.Mass.1961] 195 F. Supp. 180.

practice, the majority of the courts have held that arbitration is proper to decide all matters not included in the pre-emptive area. Likewise, the better reasoned cases hold that even where the aggrieved incident or act constitutes both a contract violation and an unfair labor practice, particularly concerning a substantive contract right such as employment or pay, the federal district courts will not be deprived of jurisdiction to grant relief as to the breach of contract, the other aspect being left to the Board." (p. 472).

"The distinguishing point is that, while an act may be both an arbitrable contract violation *and* an unfair labor practice, a 'breach of contract *is not* an unfair labor practice'; the former is enforced by the courts, the latter by the Board; the former gives to private parties a remedy, the latter uses a private right to effectuate the declared policies of the Act; * * *". (p. 473).

"But certainly an award or an agreement to arbitrate may serve to temporarily assuage the aggrieved party and afford validity to contract terms * * * until a final disposition of the matter of unfair labor practice be made by the Board. Even though the Board is not bound by an arbitration award, it may find that compliance with the award is not violative of the Act, or it may even, in the exercise of its discretionary power, decline action because an award has been made or arbitration is possible." (p. 473).

This case was decided prior to the "trilogy" but would appear to be in accord with the philosophy behind the "trilogy" which is aimed at industrial peace.

It must be noted that our case involves an actual filing of a complaint with the NLRB whereas in Cameron Iron Works there was no filing. We do not believe that this fact would change the application of the theory of that case to our problem.

This Court, based on the "trilogy" of Supreme Court decisions finds that the Teamsters are entitled to have their allegations heard in an arbitration proceeding in accord with the collective bargaining agreement.