STANDARD MOTOR FREIGHT, INC., ETC., PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. LOCAL UNION NO. 560, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued December 19, 1966—Decided March 20, 1967.

*Mr. Herbert New* argued the cause for plaintiff-appellant and cross-respondent (*Messrs. Brenner & New,* attorneys; *Mr. New,* of counsel).

*Mr. Edward A. Cohen* argued the cause for defendant-respondent and cross-appellant (*Messrs. Waldor, Beckerman, Hochberg & Franzblau,* attorneys; *Mr. Cohen,* of counsel and on the brief).

The opinion of the court was delivered by

HALL, J. This labor relations case involves an aspect of so-called "procedural arbitrability" under a collective bargaining agreement between plaintiff, the employer, a motor trucking concern engaged in interstate commerce, and defendant, the union representing its employees. The underlying question—one of interpretation of the contract—is which of several grievance forums provided by the agreement has jurisdiction over a union complaint, conceded to be substantively arbitrable, arising from the particular circumstances of the termination of employment of one of plaintiff's drivers. More precisely, the problem is whether this termination concerned "a matter of discharge," requiring that the dispute take one procedural route, or whether it did not, and so should follow another course, having possible differing consequences as to final and binding effect. The initial issue is whether this question is to be answered by a court or by one of the forums created by the agreement.

The union considered the dispute not to concern "a matter of discharge" and so brought the grievance before the forum—the first step intra-industry tribunal created by

the agreement—designated to hear non-discharge complaints. The employer objected to the jurisdiction of the forum and would not participate in the hearing on the ground that the dispute was a discharge matter and so could be heard only by the tribunal—outside arbitration—appointed to decide such controversies. It refused to comply with the award in the employee's favor and, when the union threatened a strike, commenced this suit in the Chancery Division to vacate the award.

Both parties agree that the action, brought pursuant to section 301(a) of the Labor Management Relations Act of 1947, 29 *U. S. C. A.* § 185(a), *Textile Workers Union of America v. Lincoln Mills,* 353 *U. S.* 448, 77 *S. Ct.* 912, 1 *L. Ed.* 2d 972 (1957), may be prosecuted in a state court, *Local 174, etc. v. Lucas Flour Co.,* 369 *U. S.* 95, 82 *S. Ct.* 571, 7 *L. Ed.* 2d 593 (1962). It is entirely clear, however, as both cited cases held, that substantive federal labor law, and not state law, is controlling. Accord: *Donnelly v. United Fruit Co.,* 40 *N. J.* 61, 74–75 (1963); *Jersey Central Power & Light Co. v. Local Union No. 1289, etc.,* 38 *N. J.* 95, 104 (1962); *United States Pipe and Foundry Co. v. United Steelworkers of America, etc.,* 37 *N. J.* 343, 360 (1962).

The trial court, finding that the underlying question was one for judicial determination, decided it by holding that the dispute did concern "a matter of discharge" and so that the forum which rendered the award had no power to do so and the grievance fell rather within the sole jurisdiction of the outside arbitrator. It therefore vacated the award and directed submission to the arbitrator. The Appellate Division reversed, in an unreported *per curiam* opinion. It held that "the interpretation of the contract", *i. e.,* which forum had jurisdiction, "and the application of such interpretation to the facts of the case" were, under the provisions of the agreement, "exclusively within the jurisdiction of" the second step intra-industry tribunal. It concluded that the trial court was in error in directing submission of the matter

to outside arbitration, but that the first step forum which rendered the award .had no jurisdiction either. The effect, says the union, is improperly to compel presentation of the grievance anew to the second intra-industry forum. We granted cross-petitions for certification. 47 *N. J.* 562 (1966).

The bargaining agreement involved is the New Jersey-New York Area General Trucking Agreement, negotiated on an area-wide, multi-employer, multi-union basis and affecting thousands of employees in the trucking business. We are advised that the basic form of the instrument derived from one in similar use in other sections of the country, which was originally negotiated and in considerable part drafted by laymen engaged on both sides in the industry. It utilizes a nomenclature and provisions largely meaningful only to those intimately associated with the business and the negotiations. It is not, and indeed is not intended to be, a tight, integrated commercial contract. So there appear to us, as strangers to it, a number of ambiguities, imprecise uses of language and incomplete terms. We can well understand that all of this is a necessary result of the practicalities and time and other pressures of a bargaining negotiation. We recognize too that, by the very nature of a labor contract, affecting large numbers of people, covering a wide range of conduct and an enormous variety of problems, operating prospectively over a substantial period between parties who share a degree of mutual interdependence seldom associated with simple contracts, and based upon a mass of unstated assumptions and past practices, it is essentially an instrument of government, to be considered quite differently than ordinary commercial instruments. Cox, "Reflections Upon Labor Arbitration," 72 *Harv. L. Rev.* 1482, 1490–1493 (1959) ; Shulman, "Reason, Contract and Law in Labor Relations," 68 *Harv. L. Rev.* 999, 1004–1005 (1955). As the United States Supreme Court put it in *United Steelworkers of America v. Warrior & Gulf Navi-*

*gation Co.,* 363 *U. S.* 574, 80 *S. Ct.* 1347, 4 *L. Ed. 2d* 1409 (1960):

> "The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate * * * The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.
>
> * * * * * * * *
>
> A collective bargaining agreement is an effort to erect a system of industrial self-government." (80 *S. Ct.,* at *p.* 1351, 4 *L. Ed. 2d,* at *pp.* 1415, 1416).

This concept furnishes further meaning to the statement in *Lincoln Mills* (77 *S. Ct.,* at *p.* 918, 1 *L. Ed. 2d,* at *p.* 980) that courts should fashion substantive federal labor law "from the policy of our national labor laws." Together they guide our approach and function in cases like this one.

As has been indicated, this agreement provides for three different grievance tribunals, two within the industry and one independent of it. Disputes are treated in two classifications, "matters of discharge" and all others. The former, unless the parties otherwise agree, go to the outside forum —the New Jersey State Board of Mediation (formerly called and designated in the agreement as the New Jersey State Mediation Service), *N. J. S. A.* 34:13A–7—for final and binding arbitration. The others are submitted in the first instance to one of the Joint Local Committees, the first step intra-industry forum previously mentioned. Each of these local bodies, created by an earlier contract, is composed of three designees of the employers and three of the union or unions from a local area smaller in size than the entire New Jersey–New York area covered by the agreement. If this forum decides the matter by a majority vote, the decision is final and binding. If it cannot, by reason of the equal number of its members, the dispute is referred to the second step intra-industry tribunal, the Joint Area

Committee.[1] This body, likewise originally established by a prior contract, also comprises three appointees of the employers and three of the unions, but from the entire area covered by the contract. We are told that these persons were, for the most part, negotiators of the agreement. Again, if this body decides the dispute by majority vote, the determination is final and binding. If it deadlocks, there is no provision for further arbitration of the dispute unless the Joint Area Committee, by majority vote, decides to submit the matter to an umpire. Therefore, except in "matters of discharge," this agreement does not assure final and binding arbitration of grievances. In the event of deadlock, the no-strike, no lock-out clause of the contract ceases to be effective and either party may resort to "all legal or economic recourse." [2]

Another function given to the Joint Area Committee is at the bottom of the controversy here. Section 2 of Article 7, the jurisdictional article, says that this committee "shall also act as final authority, except as otherwise provided in Article 8 of this Agreement, on all matters involving ques-

---

[1] The agreement provides that in such instance the minutes of the Joint Local Committee's proceedings on the case shall be transmitted, which "shall set forth the positions and facts relied on by each party, but each party may appear and present evidence at the hearing before the Joint Area Committee."

[2] The grievance procedure here thus differs from the typical or so-called standard scheme. Most frequently a bargaining agreement provides that "any dispute concerning the interpretation or application of any provision of this agreement," except those the contract may exclude, shall be submitted to a prescribed method of final and binding arbitration if the grievance has not been resolved by mutually acceptable settlement in the course of specified successive steps of consideration by designated representatives of the employer and the union at different levels within the plant or some larger unit.

Note may also be taken of the fact that in this agreement only the treatment of "matters of discharge" by the Mediation Board is referred to as "arbitration." Disposition of other grievances by a majority vote of the joint committees is referred to in the terminology of "settlement" of a dispute. The difference is not significant here. See *General Drivers, etc., Union v. Riss & Co.*, 372 *U. S.* 517, 83 *S. Ct.* 789, 9 *L. Ed.* 2d 918 (1963).

tions of the meaning or import of any clause or provision of this Agreement, decisions which would have general application to the majority of Employers and Local Unions who are parties to this Agreement." [3] Article 8, the procedural article, does not contain any express exception to the interpretative authority given the Area Committee in Article 7. It does contain, however, several references thereto, chiefly procedural. Note should be taken, though, that there is no reference to it in section 1(a) which provides for the arbitration of "matters of discharge" by the outside tribunal. Section 1(b), dealing with matters before the Local Committee, says that matters of interpretation, apparently arising in a dispute being heard by that body, "shall be referred to the Joint Area Committee for final decision at the request of any party." Section 1(g), treating particularly of such matters, essentially repeats the quoted provision of 1(b) and further says that the reference may be "at any time." It goes on to provide that *"all* decisions of Joint Local Committees on all matters pertaining to the interpretation of this Agreement * * * *shall automatically be reviewed* by the Joint Area Committee and that *any* decision of the Joint Local Committee *may be reviewed* by the Joint Area Committee on its own initiative at any time if any member thereof has reason to believe such decision could be or is being construed as interpretation of contract as defined in this Agreement." (Emphasis added) The subsection then strongly reiterates the purpose of such procedure, which

---

[3] It is apparent that there can also be a deadlock in the Area Committee on such a question of "meaning or import" before the factual merits of a dispute are reached. There is no provision for resolving such a deadlock.

Section 1(i) of Article 8 further provides: "In the event of strikes or work stoppages or other activities which are permitted in case of deadlock, default, or failure to comply with the majority decisions, no interpretation of this Agreement by any tribunal shall be binding upon the Union or affect the legality or lawfulness of the strike unless the Union stipulates to be bound by such interpretation, it being the intention of the parties to resolve all questions of interpretation by mutual agreement."

had been earlier stated in Article 7, in this language: "The sole purpose of this paragraph is to assure clear and uniform understanding of the meaning of all provisions of this Agreement by all parties hereto." The thesis is clear enough that, while the parties realized each Joint Local Committee must necessarily engage in contract interpretation in passing upon almost every grievance, they desired that "final authority" thereon should repose in the Area Committee, composed of men who apparently participated in the contract negotiations and so presumably would know what was intended, in the interest of uniformity throughout the contract area.[4]

While we cannot become involved in the substance of the dispute between the plaintiff and its employee, *Jersey Central Power & Light Co. v. Local Union No. 1289, etc., supra* (38 *N. J.,* at *p.* 104), and United States Supreme Court cases cited therein, we should, to place the precise issue in focus, put some facutal flesh on this procedural skeleton. The case was decided in the trial court on affidavits filed in connection with an order to show cause, so the facts to be recited come from these documentary proofs of the parties.

On the morning of July 14, 1964, plaintiff's dispatcher telephoned the employee to report for work at once for a particular driving assignment. The employee says he told the dispatcher he could not report because he was ill. The dispatcher says the employee flatly refused to work because he did not like the assignment. The employer in no way suggests that the employee indicated he was quitting his job. The conflict was not resolved by the trial judge and did not have to be. In any event, it is undisputed that the employee called his employer early that evening and asked when he was to report for work. He says he informed the employer's representative that he was then feeling better but was told that, because he had passed up the morning assignment,

---

[4] The agreement also provides in section 1(j) of Article 8: "Such Committees or arbitrators shall not be empowered to add to or subtract from this Agreement or render any decisions in conflict with this Agreement or which modifies this Agreement in any way."

there was no work for him that night. The employer says that when the employee called and asked for work, he was advised that, since he had refused to carry out a work assignment, he had voluntarily quit his job and his employment was therefore being terminated. Regardless of where the truth lies in this unresolved aspect, there is no question but that the next day the plaintiff sent the employee a letter reading:

"This letter is to confirm that you have quit your job as of July 14th, 1964 by refusing work assigned to you on this date.
You will be paid all wages and benefits due you upon your calling at this office for same."

The union took the matter up with the employer, but adjustment between them proved impossible (a prerequisite under the agreement to resort to further steps). It then filed a grievance with the Joint Local Committee, stating its contention in this language:

"Road driver could not make early start and was bypassed for trip. Company contends this was voluntary quit."

There is no doubt that the grievance was projected on the thesis that the union disputed that the employee had voluntarily quit and therefore that the employer had breached the agreement's seniority provisions through by-passing the employee for that evening's assignment and all subsequent trip opportunities to which he was otherwise entitled and so was liable for back pay "for all time lost." It is to be noted that neither the employer nor the union stated that the man had been discharged, rightfully or wrongfully.

When the grievance came on for hearing before the Local Committee, the employer, as has been said, asserted that the body was without jurisdiction since it concerned "a matter of discharge" and could be submitted only to the Mediation Board, as to which it was agreeable. The Committee did not accept the proposition, which we have to presume means

that it interpreted the agreement as intending that "a matter of discharge'" did not include a claim of "voluntary quit." The employer's representatives then left the hearing, and the union presented its case (presumably only the employee's side of the facts and contentions) in their absence. The Committee thereafter handed down the following unanimous decision, which gave rise to the litigation:

> "On the basis of the evidence, we find the position of the Union is sustained and [the employee] is to be reinstated with all back pay, less any interim earnings."

We assume this inferentially encompassed a finding that the employee did not voluntarily quit his job as a matter of fact or as a matter of implication from any refusal to accept the morning work assignment.

Two substantive provisions of the agreement ought also to be mentioned. Article 10 deals with discharge of employees. It generally provides no employee shall be discharged "without just cause" and then specifically designates certain offenses as the only causes for "immediate discharge." Refusal to accept a work assignment is admittedly not one of these offenses. With respect to other offenses, the employer may only give the employee a warning notice, which remains in effect for a specified number of months. Apparently a repetition of the same offense, or commission of another, within that period would furnish then a basis for discharge.[5] The employee involved here had not received a warning notice prior to the incident in question.

Seniority, around which the union projected this grievance, is covered by Article 5. Speaking generally, seniority, based on the date of hiring, applies not only to lay-offs and rehiring, but also to the right to the highest paid jobs (if

---

[5] Section 1(j) of Article 8 provides that "* * * Committees or arbitrators may, in cases involving disciplinary action including discharge, sustain any discharge or suspension or disciplinary action or modify such discharge, suspension or disciplinary action as they may deem just and equitable."

qualified), to choice of shift, to the privilege of having the earliest daily starting time of work, and apparently to priority as to available driving trip assignments. It is specifically provided that "seniority shall be broken only by: (1) Discharge (2) Voluntary Quit⁶ * * * (6) Unauthorized failure to report for work for seven (7) consecutive days when work is available" and that "any employee who is absent because of proven illness or injury shall maintain his seniority."

It is evident that the characterizations of this employment termination by both the employer and the union are circumlocutory and have really created the question of which tribunal should pass upon the grievance and so also the threshold issue of whether that question is one for court determination. It seems abundantly clear that if an employer calls a termination of employment a "discharge," only the Mediation Board would have jurisdiction to arbitrate the resulting grievance. Even if the employer calls it something else, but the union, in the written grievance, characterizes the event as a "discharge," it appears equally certain that the procedural route would have to be the same. Here one can surmise that the employer desired, if this employment termination was to be disputed, that it be passed upon by the Mediation Board, where the result would be binding upon the union, rather than by the intra-industry committees, where the possibility of deadlock and consequent strike action existed. But the facts seemingly did not meet the Article 10 requirements for a valid immediate discharge, so it can well be imagined that the employer used the "voluntary quit" characterization and then urged that that classification was encompassed within "a matter of discharge."

---

[6] In only two other places in the agreement is there reference to "voluntary quit" or "quitting," Article 5, section 4(b) and Article 10, section 5. While selection of the terms might be thought of as in contradistinction to "discharge," nowhere are they used in the same context as "matter of discharge" in the grievance procedure provisions. The terms are nowhere defined in the agreement. In fact it contains no definition section.

The union, on the other hand, may be thought not to have been desirous that the matter go to outside arbitration, also for tactical reasons, and so it characterized the event as a breaking of seniority rather than an improper discharge. Bringing in the seniority concept would not seem to add anything of pertinence, for the basic issue remains: was the man's employment validly terminated. If it was, his seniority disappeared with his employment; if it was not, he would certainly be entitled to reinstatement with back pay and his same seniority rights. The bifurcated grievance procedure is thus at the root of the circumlocution and of the underlying question whether "a matter of discharge" encompasses any employment termination beyond one plainly called a "discharge" on its face by one side or the other, but these provisions of the contract are what the parties agreed to and we have to deal with the case on the basis of them in the light of federal labor law.

 A court must always look at any question relating to arbitrability from the fundamental point of view laid down by section 203(d) of the Labor Management Relations Act, 29 *U. S. C. A.* § 173(d):

"Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement * * *"

As the court said in *United Steelworkers of America v. American Manufacturing Co.,* 363 *U. S.* 564, 566, 80 *S. Ct.* 1343, 1346, 4 *L. Ed. 2d* 1403, 1406 (1960): "That policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." The clear thesis is that the judicial role should be a very limited one, considerably less even than the restricted court function in commercial arbitration matters.

 The United States Supreme Court has laid down, as a matter of federal labor law, a rather sharp, almost arbi-

trary, line to determine when an arbitration question under a bargaining agreement is for court decision and when it is not, *i. e.*, to be resolved within the grievance process itself. It has said that, absent clear expression in the contract to the contrary, it is a court obligation to resolve matters of "substantive arbitrability," namely, whether the particular grievance is within the scope of the arbitration clause specifying what the parties have agreed to arbitrate. Two quotations from the landmark cases summarize the rule and the basis for it:

"The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." (*United Steelworkers of America v. American Manufacturing Co.*, *supra*, 363 *U. S.* 564, 567–568, 80 *S. Ct.* 1343, 1346, 4 *L. Ed.* 2d 1403, 1407).

"The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." (*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, *supra* (363 *U. S.* 574, 582-583, 80 *S. Ct.* 1347, 1353, 4 *L. Ed.* 2d 1409, 1417–1418).

See also *Atkinson v. Sinclair Refining Co.*, 370 *U. S.* 238, 82 *S. Ct.* 1318, 8 *L. Ed.* 2d 462 (1962); *Drake Bakeries v. Local 50*, 370 *U. S.* 254, 82 *S. Ct.* 1346, 8 *L. Ed.* 2d 474 (1962).

However, when it comes to questions of "procedural arbitrability," *i. e.,* whether procedural conditions to arbitration have been met, the court holds very definitely that such should be left to the arbitrator. *John Wiley & Sons v. Livingston,* 376 *U. S.* 543, 84 *S. Ct.* 909, 11 *L. Ed.* 2d 898 (1964). The conclusion was reached as a broad policy matter, with universal applicability (again unless the particular agreement most specifically provides otherwise). The contract thesis, which led to the opposite result in the substantive cases, was not discussed. The court stressed that ordinarily procedural problems in arbitrations cannot be answered without consideration of the merits of the dispute, in which a court should not become involved, and that undesirable delay and fragmentation would result from carving up the same dispute between a court and the arbitration forum when the substantive subject matter is arbitrable. Mr. Justice Harlan concluded for a unanimous court: "* * * we think it best accords with the usual purposes of an arbitration clause and with the policy behind federal labor law to regard procedural disagreements not as separate disputes but as aspects of the dispute which called the grievance procedures into play." (376 *U. S.,* at *p. 559,* 84 *S. Ct.,* at *p.* 919, 11 *L. Ed.* 2d, at *pp.* 909–910).

██ Here there is not the slightest doubt that the grievance over the propriety of this termination of employment is, under the contract, arbitrable by one tribunal or the other. The employer urges, however, that, as a pure matter of law, the decision as to which forum should hear the matter ought to be made by a court because the problem is more like one of "substantive" than of "procedural arbitrability." It argues, resorting to the contractual thesis of the substantive arbitrability cases, that "just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so *a fortiori,* it cannot be compelled to submit a dispute for final determination to an arbitration forum which it has not agreed should hear and determine the matter." It also offers a broader base for its position in a statement plucked from

the concurring opinion of Mr. Justice Brennan in *American Manufacturing Co.* and *Warrior & Gulf Navigation Co.* that "* * * the threshold question, the meaning of the arbitration clause itself, is for the judge unless the parties clearly state to the contrary." (363 *U. S.,* at *p.* 571, 80 *S. Ct.,* at *p.* 1365, 4 *L. Ed. 2d,* at *p.* 1433).

We think the contention cannot be accepted. The observation of Mr. Justice Brennan was made in the context of questions of substantive arbitrability—whether the arbitration clause was intended to include the kind of dispute involved. The statement preceded the decision in *Wiley* by some four years and, if read as broadly as the employer suggests, would run counter to the conclusion there reached. While it can be said that which of two tribunals is to hear a grievance is a matter of greater importance to the contracting parties than adjective arbitration details, it is still in essence procedural. Although *Wiley* was concerned with a claim that arbitration of a dispute found to be within the scope of the arbitration clause was nonetheless barred because the prescribed preliminary steps to settle the grievance within the plant had allegedly not been followed, the court spoke strongly and broadly in holding that whether "procedural" conditions to arbitration had been met or excused was to be decided by the arbitrator and not by the court. It did not even refer to the contractual thesis which might be thought to point the other way. In the face of such a positive and inclusive view, we feel constrained to say that the threshold issue here, considered as an abstract matter of law, cannot be found to be one for the court.

 The next question is whether the language of this agreement indicates a clear intention of the parties to negative this rule and to provide in effect that whether a dispute "concerns a matter of discharge" is a judicial question and not one for determination within the grievance procedure itself. The employer claims that it does. As has been pointed out, the grievance scheme of this contract is very positive in reposing in the Joint Area Committee the power and

duty to act as final authority on all questions involving the meaning or import of any clause or provision of the entire agreement which would have general application to assure clear and uniform understanding by all the area employers and unions involved, "except as otherwise provided in Article 8." Though Article 8 is silent as to any such exceptions, the employer argues that the provision thereof committing all "matters of discharge" to the Mediation Board for final arbitration necessarily deprives the Area Committee of power to pass upon questions of contract interpretation with reference thereto, including the authority to determine, as here, whether a particular dispute does "concern a matter of discharge." The trial court agreed with this contention and it was on this basis that it decided the interpretation of "matter of discharge" to be one for the court and then proceeded to interpret the quoted phrase to encompass this termination of employment. While the union concedes that it is a court question to determine, as a matter of construction of the contract, *whether* the Joint Area Committee *was given the power* to interpret the word "discharge" in Article 8, it urges that the trial court was wrong in holding that the Committee *did not have that power* by reason of the exception clause quoted above. We are convinced the union's view is the correct one.

We think that this exception to the Area Committee's interpretive powers was intended to come into operation only *after* a dispute within the jurisdiction of the Mediation Board has been submitted to it for arbitration (or after a deadlocked case within the jurisdiction of the joint committees has been submitted to an umpire by majority vote of the Joint Area Committee). It would indeed be so awkward and so contrary to the whole idea of outside arbitration as not reasonably to have been intended, to have interpretation questions arising *during* a proceeding before an outside arbitrator referred to the Area Committee for determination or to have that arbitrator's supposed final award reviewable by the Committee after it had been rendered. The question

of whether a dispute "concerns a matter of discharge", *i. e.*, the meaning of "discharge" in relation to which grievance tribunal has jurisdiction, is quite a different matter. In view of the strong provisions of this agreement reposing the final resolution of interpretation questions in the Area Committee to achieve uniformity—questions which involve what the contracting parties intended and a body apparently thoroughly acquainted with such intentions—, it seems clear enough to us that the parties meant the Area Committee, rather than a court, to have the power to and to decide whether a dispute "concerned a matter of discharge" and so in which tribunal it should be arbitrated. Considered as a whole, we believe the provisions relative to contract interpretation evidence, not a negativing of the rule of *Wiley* in the instant situation, but instead plain support for its application. We are thereby giving "full play" to the "means chosen by the parties for the settlement of their differences," within the differentiating line drawn by the United States Supreme Court. This we understand to have been the rationale of the Appellate Division's decision in this respect and accordingly, on the employer's appeal, we affirm that court. While this conclusion still has some awkward aspects, in the possibility of deadlock in the Area Committee on this very interpretation question of which forum has jurisdiction of the dispute and in the fact that handling of a "discharge" grievance may be fractionated, albeit only at a preliminary stage, this again is what the parties agreed to, which should not be overridden by a court.

We may add that we find nothing indicating to the contrary in *Humphrey v. Moore*, 375 *U. S.* 335, 84 *S. Ct.* 363, 11 *L. Ed. 2d* 370 (1964), cited by the employer, where the contract specified a somewhat similar provision for the resolution of questions of interpretation by a second step, intra-industry committee. Footnote 8 at 375 *U. S.* 345, 84 *S. Ct.* 370, 11 *L. Ed. 2d* 379, particularly pointed to, seems to us to support the view we have expressed that the power of that committee, like whether the Joint Area Committee

here was given the authority to decide whether a dispute "concerned a matter of discharge," was an issue for a court to decide. And, of course, we do not reach the question whether the employment termination at bar was "a matter of discharge" and so which tribunal was empowered to pass upon the grievance. That is for the Joint Area Committee to determine.

This brings us to the union's cross-appeal. It complains of the nature of the Appellate Division's remand which it says, by reason of the holding that the Joint Local Committee had no jurisdiction and that the jurisdiction interpretation question and the application thereof to the facts were exclusively within the jurisdiction of the Joint Area Committee, results in requiring a complete retrial of the grievance before the Area Committee. It urges instead that the appropriate procedural direction is to allow the employer now to appeal the interpretation question—whether the Joint Local Committee or the Mediation Board has the jurisdiction to hear and determine this grievance—to the Area Committee and, if that forum's decision thereof is that the grievance did not "concern a matter of discharge" and so belonged before the Local Committee and not the Mediation Board, the Local Committee's award on the merits in the employee's favor should stand without further presentation of evidence thereon before the Area Committee. (Of course, if, following such an appeal by the employer, the Area Committee decided this employment termination did "concern a matter of discharge," the grievance would have to go to the Mediation Board, and be fully represented there, and the award made by the Joint Local Committee would become null and void. Although the Appellate Division did not specifically advert to this possibility, its disposition direction has to be read as including it.)

This matter of further proceedings with respect to this grievance is complicated by the position the employer took before the Local Committee that only the Mediation Board could hear the dispute (and its further view that any quarrel

over that was for a court to resolve), questions which had then not been resolved by any authoritative tribunal. The problem is not likely to arise again, since it would seem that any jurisdiction interpretation question arising in the inception before the Local Committee would be referred immediately and before the merits were gone into, at the request of one of the parties, to the Area Committee for decision, a right given by section 1(g) of Article 8 heretofore mentioned. Since an appeal on such a question is by the same section allowed "at any time," the employer is entitled to take that appeal to the Area Committee even now and we believe, as the union suggests, that such a course is the appropriate disposition. The interpretation question here involved is obviously a very important one to be settled and indeed, if the employer did not take such an appeal, it would be fitting for the Area Committee to review the matter on its own initiative pursuant to the further provisions of section 1(g).

Whether the Area Committee should, if it determines original jurisdiction is in the Joint Local Committee rather than the Mediation Board, hear the grievance anew on the merits since the employer's side of the dispute apparently has never been presented or allow the Local Committee's award to stand is, we believe, a procedural matter for the determination of the Area Committee and not of a court. Under the circumstances, we are not convinced it is necessarily required to accept the union's contention that the award must stand without further evidence.

Since the Appellate Division's procedural disposition was not in strict accord with the views just expressed, its judgment in this aspect is modified accordingly. Otherwise it is affirmed. No costs to either party.

*For modification and affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.