**INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY, Defendant.**

**No. 65 Civ. 2661.**

United States District Court
S. D. New York.
Jan. 26, 1968.

Irving Abramson, New York City, for plaintiff; Robert Friedman, New York City, of counsel.

Nordlinger, Riegelman, Benetar & Charney, New York City, for defendant; David L. Benetar, Thomas F. Hilbert, Jr., Michael I. Bernstein, New York City, of counsel.

## OPINION

WEINFELD, District Judge.

The plaintiff Union moves for summary judgment in this action commenced by it pursuant to section 301 of the Labor Management Relations Act of 1947 [1] to compel, pursuant to the terms of collective bargaining agreements with the defendant, arbitration of eight grievances.[2] The grievances arose at four different plants of the defendant where Locals chartered by the plaintiff represented the employees. The grievances were processed at the Local level under the grievance procedure provided for by the National Collective Bargaining Agreements, but remained unsettled and the defendant refused arbitration. Two of the grievances arose during the existence of the 1960 Agreement, which continued in effect until September 29, 1963; the remaining six arose under the succeeding agreement, referred to as the 1963 Agreement. The plaintiff asserts that each grievance involves the interpretation or application of one or more provisions of those Agreements or a disciplinary penalty imposed by the defendant, and hence is arbitrable under the applicable National Agreement. The defendant resists arbitration upon the ground that each grievance is beyond the reach of the applicable Agreement—that each is specifically and expressly excluded from the arbitral process. As to one item, in addition to non-arbitrability, the defendant contends that the issue in-volved therein was resolved in its favor by the National Labor Relations Board, and consequently arbitration is fore-closed as a relitigation of an adjudicated issue.

The parties are in accord that no issue of fact is raised and that the matters presented are ripe for disposition under the summary judgment rule.

■ The applicable law is clear and is governed by the trilogy of the Steel-workers' cases decided in 1960.[3] As this court summarized the doctrine of those cases:

"The underlying rationale of those holdings rests upon the federal policy to promote industrial peace through collective bargaining agreements and the recognition that a major factor in achieving that objective is the grievance machinery established by the parties to resolve disputes as part and parcel of the collective bargaining process itself. Although viewed in so favorable a climate, the arbitral process for the resolution of grievances is not imposed by law, but must rest upon a consensual basis. Thus the Court's role is limited. It has no concern with the merits of any particular grievance. Its sole inquiry is restricted to whether the parties did agree to arbitrate the grievance. The issue is to be decided within the framework of their collective bargaining agreement. And when the parties have entered into a comprehensive arbitration provision, any challenge that a grievance is not intended to be covered thereunder must find support in unmistakably clear language of exclusion; arbitration of a particular dispute is to be ordered unless it may be

---

1. 61 Stat. 156, 29 U.S.C. § 185.

2. Originally the complaint alleged 9 unresolved grievances, but subsequent to the commencement of suit one was settled.

3. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). See also Carey v. General Elec. Co., 315 F.2d 499 (2d Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964); Procter & Gamble Independent Union of Port Ivory N. Y. v. Procter & Gamble Mfg. Co., 298 F.2d 644 (2d Cir. 1962).

said with positive assurance that it is excluded by the contract. Whatever doubts exist as to whether the grievance is within the ambit of the arbitral process are to be resolved in favor of coverage." [4]

■ Defendant claims, as we shall see, that, at least as to the grievances asserted under the 1963 Agreement, the force of this doctrine has been attenuated —if not rendered inapplicable—by the express intent of the parties. Thus, we approach each individual contested grievance, mindful of both the duty to recognize the contractual intent of the parties and the duty to effectuate the "preference of national labor policy for arbitration as a substitute for tests of strength between contending forces." [5]

### The 1960 Agreement

The 1960 Agreement, which covers two grievances, provides for arbitration of any grievance that remains unsettled after having been processed through an initial three-step grievance procedure, and involves either:

"(a) the interpretation or application of a provision of this Agreement, or

(b) a disciplinary penalty (including discharge) * * * which is alleged to have been imposed without just cause." (Article XV, section 1)

The Agreement further provides that:

" * * * [N]o arbitrator shall have any authority to add to, detract from, or in any way alter the provisions of this Agreement."

and that

" * * * [N]o arbitrator shall have the authority to establish or modify any wage, salary or piece rate, or job classification, or authority to decide the appropriate classification of any employee. * * * " (Article XV, sections 3(a), (b))

### NATIONAL DOCKET NO. 7309

[Polizotti—Local 201, Lynn, Mass.]

Polizotti is a toolmaker who applied for one of two open diemakers' positions. The wage rates for the two jobs were the same. The position required diemaking experience. After interviewing Polizotti and other employees, management concluded that while Polizotti had some die repair experience, his diemaking background was virtually nonexistent. Two employees, less senior to Polizotti, but who management decided had more experience, were given the positions. A grievance complaint on Polizotti's behalf was prosecuted without success. The demand for arbitration followed.

Article VI, section 5(c) (4) provides:

"The company will, to the extent practical, give first consideration for job openings and upgrading to present employees when employees with the necessary qualifications are available. In upgrading employees to higher rated jobs, the Company will take into consideration as an important factor, the relative length of continuous service of the employees who it finds are qualified for such upgrading."

The plaintiff's position is that the available diemaker's position was a "job opening" within the contemplation of the above provision, and the defendant's refusal to grant it to Polizotti constituted a violation. The defendant urges, to the contrary, that it is inapplicable; that the job involves neither a "job opening" which, in its view, applies only to present employees vis-à-vis new employees, nor an "upgrading," but only a lateral transfer without monetary gain, since the rates were the same; that consequently management's refusal to grant Polizotti's request was not a violation of the Agreement.

---

4. International Union of Elec., Radio and Machine Workers A.F.L.-C.I.O. v. Westinghouse Elec. Corp., 218 F.Supp. 82, 83-84 (S.D.N.Y.1963), aff'd on opinion below, 326 F.2d 758 (2d Cir. 1964).

5. John Wiley & Sons v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L. Ed.2d 898 (1964).

■ The plaintiff, apart from its "job opening" contention, asserts that the diemaker classification was an "upgrading" by reason of advantages which that position offered. In substance it is claimed that Polizotti, had he obtained the diemaker's position, would have been in an advantageous position, since, in the event of layoffs due to lack of work, a toolmaker without diemaking experience cannot bump a diemaker. This upgrading contention appears to be a rather weak reed upon which to rely,[6] but whatever its merits or the relative positions of the parties on the issue of "job opening," their very contentions center about the "interpretation or application of a provision of this Agreement"; accordingly, the grievance is subject to arbitration under Article XV, section 1(a).

### NATIONAL DOCKET NO. 7788
[Barbara Papagelis—Local 201, Lynn, Mass.]

Preliminarily, an issue is raised as to whether the 1960 or 1963 Agreement applies to this claim. The plaintiff contends that the grievance arose under and is governed by the 1960 Agreement, which continued in effect until September 29, 1963. The defendant concedes that "initially it arose under the 1960 Agreement," but urges the 1963 Agreement governs because after the grievance procedure failed to resolve the matter, the request for arbitration had been made under the sixty-day provision of the 1963 Agreement [7] rather than under the thirty-day provision of the 1960 Agreement, emphasizing that a sixty-day request under the latter Agreement would have been untimely.

■ The grievance arose, the operative facts occurred and it was processed during the existence of the 1960 Agreement; accordingly, its provisions are applicable. The fact that the request for arbitration was not submitted within thirty days after the final decision as stipulated under the 1960 Agreement did not bring the 1963 Agreement into play. The defendant's failure to object that the notice was untimely under the 1960 Agreement may have constituted a waiver; in any event, if the grievance is subject to arbitration, the issue of untimeliness is procedural and is for determination by the arbitrator.[8] Accordingly, we turn to the question of the substantive arbitrability of this grievance under the 1960 Agreement.

Due to lack of work at defendant's Lynn, Massachusetts plant, Barbara Papagelis was laid off on May 16, 1963. She had then worked there over three years. She contended that any one of three other employees should have been laid off first. These employees had not worked at the Lynn plant as long as Miss Papagelis—in fact, they were employed there only about nine weeks. However, respectively, they had twelve (12), thirteen (13) and twenty-seven (27) years service with the defendant, mainly at the East Boston, Massachusetts plant, where the employees had been represented for collective bargaining purposes by a union other than the plaintiff union. The East

6. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S. Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960): "The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware." See also Trailways of New England, Inc. v. Amalgamated Ass'n of Street Employees, 353 F.2d 180 (1st Cir. 1965).

7. Article XV, § 1(a).

8. John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). See Local 1401, Retail Clerks Int'l Ass'n, A.F.L.-C.I.O. v. Woodman's Food Market, 371 F.2d 199 (7th Cir. 1966); Local Union No. 490, United Rubber, etc., Workers v. Kirkhill Rubber Co., 367 F.2d 956 (9th Cir. 1966); United Steelworkers of America v. American Int'l Aluminum Corp., 334 F.2d 147 (5th Cir. 1964), cert. denied, 379 U.S. 991, 85 S.Ct. 702, 13 L.Ed.2d 611 (1965); Carey v. General Elec. Co., 315 F.2d 499 (2d Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964); Standard Motor Freight, Inc. v. Local Union No. 560, Int'l Bhd. of Teamsters, 49 N.J. 83, 228 A.2d 329 (1967). Cf. World Brilliance Corp. v. Bethlehem Steel Co., 342 F.2d 362 (2d Cir. 1965).

Boston plant was closed in March 1963; the employees there, including the three in question, were transferred to the Lynn plant; the defendant gave them credit for their years of service at the East Boston plant, which gave them greater seniority than Miss Papagelis.

The Union contended that the laying off of Miss Papagelis on the basis of recognition of the accumulated continuous service of the three employees was in violation of Articles VIII and XI, which govern, respectively, continuity of service and layoffs, and the Preamble to the Agreement. The Preamble includes Local 201 (the Lynn, Massachusetts plant Local) as one of the local unions on whose behalf the plaintiff acted in entering into the National Agreement.

Article XI provides:

## "REDUCTION OR INCREASE IN FORCES

"1. Whenever there is a reduction in the working force or employees are laid off from their regular jobs, total length of continuous service, applied on a plant, department, or other basis as negotiated locally, shall be the major factor determining the employees to be laid off or transferred (exclusive of upgrading or transfers to higher rated jobs). However, ability will be given consideration.

\* \* \* \* \* \*

"2. Since the number of employees in the individual bargaining units covered under this Agreement varies from less than 50 to more than 10,000, each Local shall negotiate with local Management a written Agreement covering the layoff and rehiring procedure for the employees represented by the Local.

"3. Employees who have been or who may be transferred to jobs outside the bargaining units, may be returned to their former classification in the bargaining unit in accordance with their total length of continuous service."

The defendant, in resisting arbitration, refers to the Agreement antecedent to the 1960 Agreement, which covered the period from 1955 to 1960, wherein Article XI, section 3, contained the same terms quoted above of the 1960 Agreement, except that it included at the end the following sentence:

"Employees in any plant who have been certified in a bargaining unit not covered by this Agreement shall have no rights under this Agreement."

The defendant asserts that this latter provision had been eliminated from Article XI of the 1960 Agreement because of its alleged illegal discrimination in transfers in and out of a bargaining unit on the basis of union or non-union status of the transferees based upon a decision of the National Labor Relations Board.[9] Whatever the reason for the deletion of the sentence from the 1960 Agreement, the defendant here contends that in consequence of its omission the grievance is not arbitrable inasmuch as it does not involve the "interpretation or application of a provision of this Agreement." The plaintiff, however, does not rely upon the deleted material; it does rely upon the present Article XI, as well as Article VIII. It contends that thereunder the Local plant seniority favors the grievant and that the accumulated service of defendant's employees not previously employed at the Lynn plant may not be carried over. It argues that Article XI (1), which, with respect to layoffs, provides that "total length of continuous service, applied on a *plant*, department, or other basis as negotiated locally, shall be the major factor \* \* \*" (emphasis supplied), as well as Article VIII, "Continuity of Service," entitled her to hold her place against the three East Boston plant employees.

The fact, as defendant urges, that in the case of the Lynn plant no Local Seniority Supplement Agreement was entered into does not conclude the issue. That the Local Union failed to

---

9. International Ass'n of Machinists (Menasco Mfg. Co.), 123 N.L.R.B. 627 (1959), modified on other grounds, 279 F.2d 761 (9th Cir.), cert. denied, 364 U.S. 890, 81 S.Ct. 221, 5 L.Ed.2d 187 (1960).

agree upon Local layoff procedures did not vitiate the National Agreement on this subject. Thus, even in the absence of a locally negotiated seniority policy, there remains the issue of whether, under the unsupplemented Article XI of the National Agreement, the transferee employees carried their seniority with them. The contentions, whether they have merit or not—a matter which is not for the court—involve the "interpretation or application of a provision" of the Agreement. The grievance is one that is not foreclosed from arbitration.

### The 1963 Agreement

We next consider the remaining six grievances which are governed by the 1963 Agreement. The parties renewed the prior arbitration clause which covered the "interpretation or application of a provision of this Agreement" or "a disciplinary penalty (including discharge)." [10]

However, the parties amplified the arbitration clause. They set forth "principles" which recognized (1) that some types of grievance disputes were arbitrable as a matter of right; (2) that others were subject only to voluntary arbitration; and (3) that the defendant's right to manage and conduct its business was unimpaired, subject only to the terms of the Agreement. In addition, in what the plaintiff concedes was a deliberate purpose to enlarge the exclusionary language of the arbitration provisions, it was provided in Article XV, section 4(b) (v):

"No matter will be considered arbitrable unless it is found that the parties clearly agreed that the subject involved would be arbitrable in light of the principles of arbitrability set forth in this Article and no court or arbitrator shall or may proceed under any presumption that a request to arbitrate is arbitrable. * * *

"6. (a) Arbitration as a matter of right includes only requests to arbitrate which involve:

(i) Disciplinary action (including discharge) but with certain exceptions spelled out in this Article;

(ii) The claimed violation of a specific provision or provisions of the National Agreement (with the limitations and exceptions set out in this Article);

* * * * * *

"6. (b) A request for arbitration in order to be subject to arbitration as a matter of right under the provisions of subsection (a) (ii) * * * must allege a direct violation of the express purpose of the contractual provision in question, rather than of an indirect or implied purpose. * * *"

Upon the basis of the foregoing, the defendant contends that each of the remaining six grievances is completely barred from arbitration. The essential issue before the court is whether these six grievances were excluded from the arbitral procedure by the parties' agreement.

### NATIONAL DOCKET NO. 8290
### [Schenectady Plant]

This involves what the Union insists was disciplinary action and which the defendant, with equal vigor, denies. On the morning of November 25, 1963, the day of President Kennedy's funeral, the defendant, in order to permit its observance by employees, announced a cessation of work during the hours of 11:30 a. m. to 2 p. m. with pay, provided the employees returned to work at 2 p. m. Operations were suspended, and those who returned to work received payment for the hours in question. A number of employees, however, failed to return and were not paid for those hours; they were paid only for the actual hours worked on that day.

The Union contends that management's refusal to pay those employees who failed to return to work constituted a disciplinary penalty which, under Article XV 1(b) is arbitrable.

Related thereto is the claim that the suspension of operations by the defendant was unilateral action which changed

10. Except that time to request arbitration was fixed at 60 instead of 30 days.

the hours of work and constituted a violation of Article V 1(a) and (c), which required at least one week's notice.[11]

The company takes issue with the plaintiff's respective contentions. Affirmatively the defendant contends that it put into effect what it describes as "an extra-contractual partial holiday for the period of the funeral"—a "non-recurring furlough."

However one views the merits of the Union's alleged grievance arising out of the company's intended good will gesture, the fact is that the claim of violation of the workweek provision raises an issue, as does the claim that the nonpayment for the hours in question constituted a disciplinary penalty, of interpretation of specific provisions of the Agreement.

 Moreover, one aspect of this grievance, the charge that the defendant imposed the suspension of operations unilaterally, presents an issue of fact going directly to the merits of the grievance. The defendant asserts that the suspension of operations had been put into effect only after it had been discussed with Union representatives and that their reaction was favorable. Whether such discussion was had, and, if so, whether the claimed reaction can be construed as consent or waiver of the workweek requirements, and further, whether it was within the authority of those officials is for the determination by the arbitrator—not by the court.

 The court holds this grievance is arbitrable.

**NATIONAL DOCKET NOS. 8427, 8643 9280 and 9349**
**[Local 255, Pittsfield, Mass.]**

These four grievances present substantially similar issues. They center about Article VI 4 entitled "Piece Prices—Hourly Rated Piecework Employees." Piece prices are classified thereunder as "Standard," "Temporary" and "Special," as follows:

"4. (a) (1) A Standard Piece Price is one set where the manufacturing method has become established.

"4. (a) (2) A Temporary Piece Price is one set where the manufacturing method is under development or has been changed, or the average pieceworker on the job has not yet attained normal performance.

"4. (a) (3) A Special Piece Price is one set on work which usually repeats infrequently or is in small quantities or has some special feature or purpose."

It is further provided:

"4. (b) There will be no change in a standard price except where there is a change in manufacturing method. * * *

"4. (c) Subject to the foregoing, the Company will replace a temporary price with a standard price within six months if reasonably possible under the circumstances."

**(1) ND 8427**

ND 8427 involves a tap selector's job at the Pittsfield plant. The Union contended that although the tap selector's job had been in effect for twenty years, the company had failed to set a Standard

---

11. ARTICLE V: "1. (a) *Workweek*
"The regular working week for both salaried and hourly rated employees shall be 40 hours per week, 8 hours per day, 5-day week, from Monday to Friday inclusive. The workweek on multiple shifts may be less than 40 hours.
* * * * *
"(c) When a change is made in the hours of work or working schedules of substantially all employees of a plant or a department thereof, local Management will notify the employees and the Locals respectively affected at least one week in advance of the effective date of such change. When a change is made in the hours of work or working schedules of various individuals or smaller groups of employees, the Foreman will give the affected employees and their Union Steward as much notice as possible. * * *"

Piece Price. It also contended that at one time a Standard Piece Price had been set, but thereafter a methods change was effected and the price was changed; however, when defendant returned to the prior method it failed to reinstate the Standard Piece Price. The plaintiff charged that the defendant's action was a direct violation of Article VI, section 4(b).

The defendant acknowledges that prior to 1953 the job was classified as Standard Piece Price, but in that year, after Local negotiations with plaintiff, the job was established as a Special Piece Price one, which defendant further asserts was reconfirmed during Local negotiations in 1955, and that ever since the job has remained Special. Consequently it denies any violation.

(2) ND 8643

This grievance involves a new pricing structure for the Pacific Shear in the Power Transformer Tank Unit operation. Since 1950 the operation had been classified, according to the defendant's contention, as a Special Piece Price operation, which had been established on a "flat percentage factor." However, in November 1963, the company substituted a series of predetermined special price time values for the flat percentage factor. The plaintiff contended that the new pricing system, made after thirteen years, was not occasioned by any change in the manufacturing method and so violated Article VI, section 4(b).

The defendant asserts that the foregoing provision is inapplicable, since the original price fixed was not Standard and the plaintiff is seeking a reclassification.

(3) ND 9280 and 9349

These grievances center about a change of prices for Cover & Base Welding Groups of the Power Shear Transformer Tank Unit. ND 9280 involved a change with respect to Power Transformer Cover Welder; ND 9349 involved a change in Layout Tack Weld-Weld Bases.

The Union charges in each instance a change in Standard price without a corresponding change in manufacturing method which allegedly constituted a violation of Article VI, section 4.

The defendant acknowledges these operations in 1954 were established on a Standard price basis, but that as a result of Local negotiations in May 1956 were put on a Temporary and Special price basis. The defendant asserts that the prices on the Cover Welding Group (ND 9280) have remained Temporary since that time; however in November 1964, after the prior introduction of extensive methods and set-up changes, it put into effect a new Temporary pricing system in lieu of the previous Temporary prices.

As to the Base Cover Group (ND 9349), the defendant asserts that this also has been Temporary since 1956—that in 1963 "certain changes in the price system occurred," but the prices remained Temporary. The plaintiff charges that the pricing structure was not in fact Temporary, but was Standard, and that there were no corresponding methods changes which justified the new pricing system.

In each instance the defendant, in addition to its denial of plaintiff's claim, asserts that the alleged grievance has been expressly placed beyond the reach of arbitration as a matter of right by virtue of Article XV, section 7(e), and related sections, which provide:

"7. * * * [I]t is specifically agreed that arbitration requests shall be subject only to voluntary arbitration, by mutual agreement, if they * * *

"(e) Would require an arbitrator to consider, rule on or decide the appropriate hourly, salary or incentive rate at which an employee shall be paid, or the method (day, salary or incentive) by which his pay shall be determined. (See footnote)

* * * * * *

"Footnote: Subsections e, f, and g above reflect the fact that this National Agreement does not set out specific rates or classifications for

jobs, and are designed to confirm the intent of Article VI, Section 1 and Article VI, Section 5 (first sentence) that disputes over individual job classifications, rates of pay, incentive standards, etc., are assigned by the parties to local negotiations, and not to arbitration."

Article VI, section 1—referred to in the above footnote to section 7(e), provides:

"Any question which affects hourly rates, piecework rates or salary rates of individuals or groups shall be subject to negotiation between the Local and the local Management."

Accordingly, the defendant argues these limitations upon the arbitrator foreclose consideration of the grievances.

The plaintiff, in reply, contends that the defendant's classifications of the jobs at issue as "Special" or "Temporary" violate the Agreement, and that they should be "Standard," as defined in the Agreement. In sum, they differ as to whether the new pricings violate or conform to the Agreement. The issue involves a specific provision of the Agreement, Article VI, section 4. Despite the defendant's contention, the arbitrator, with respect to the dispute, is not called upon to consider, rule upon or decide an appropriate hourly, salary or incentive rate—these have already been determined by the parties. He is called upon to decide whether the classifications for piece prices, as defined by the parties under Article VI, section 4, have been properly applied by the defendant or, as plaintiff charges, whether the defendant, by an incorrect classification of a rate to a job, violated the terms of Article VI, section 4.[12] The issue to be presented to the arbitrator is whether the piecework rates, as defined by the parties, have been applied

by the defendant in accordance with the Agreement. Its determination involves the interpretation or application of Article VI, section 4, and so is subject to arbitration.

## NATIONAL DOCKET NO. 8759
### [Trenton, N. J. Plant]

This grievance involved welders employed at the Trenton, New Jersey plant. According to the Union, the men had certain grievances with respect to classification and sought reclassification. The grievances were processed through the three-step grievance procedure, but remained unresolved. Thereupon the men went out on strike. They were out some time and efforts to resolve the dispute failed. Thereafter the defendant, by letter dated April 2, 1964, advised the strikers that if they failed to return to work it would be forced to replace them in order to resume operations. All but fifteen welders returned to their jobs, following which the defendant hired others in their place.

The Union contends that the strike was a protected right under Article XIV, section 1 of the Agreement,[13] and that the discharge of the men constituted a disciplinary penalty without just cause and consequently is arbitrable as a matter of right under Article XV 1(b).

The defendant contends that the strike was an economic strike, that the men were neither discharged nor disciplined, but voluntarily elected not to return to their then vacant positions, whereupon they were permanently replaced.

When others were hired in place of the fifteen, the Local filed unfair labor charges with the National Labor Relations Board, alleging a discriminatory discharge by the defendant of the fifteen employees in violation of section 8(a) of the National Labor Relations

---

12. Cf. International Union of Elec., Radio and Machine Workers (A.F.L.-C.I.O.) v. Westinghouse Elec. Corp., 268 F.2d 352 (3d Cir. 1959).

13. Article XIV, § 1 prohibits strikes or lockouts with respect to any matter subject to the grievance procedure, unless and until the successive steps of the grievance procedure have been complied with or the matter submitted to arbitration.

Act.[14] Simultaneously, the grievance was processed under the grievance procedure of the Agreement without success, following which the Union's demand for arbitration was refused by the defendant.

The Regional Director, whose decision was sustained by the General Counsel, found that the investigation "failed to reveal sufficient evidence to establish that the Employer threatened those striking welders with discharge rather than with replacement in violation of section 8(a) (1) of the Act because they were engaged in said strike * * " and accordingly refused to issue a complaint.

The company contends that the determination by the National Labor Relations Board was final and binding and precludes arbitration of the issue of the cause of discharge of the men and necessarily deprived an arbitrator of jurisdiction to determine the question of whether the discharges were for just cause.

The Union contends that arbitrability of that issue, since it arises under the contract, is not debarred by the Board's determination, which involved an issue under a statutory proceeding. Thus, the question before this court is whether the Board's refusal to issue a complaint charging the defendant with an unfair labor practice by reason of the discharges forecloses an arbitrator from inquiring, under the parties' collective bargaining agreement, whether the discharges were imposed without just cause.

A number of factors require rejection of the plea advanced by the defendant. First, a charge of an unfair labor practice based upon an alleged discriminatory discharge in violation of law is not necessarily co-extensive with a charge of an alleged discharge without cause in violation of an agreement.

Second, the doctrine of res judicata or collateral estoppel is inapplicable since the proceeding before the Board was an investigation to determine if a complaint charging the employer with an unfair labor practice should issue. No hearing was held; the Board's determination that a complaint was not warranted rested upon an administrative inquiry. It was not an adjudicative adversary proceeding.[15] Moreover, the doctrine of preemption does not foreclose this court from ordering arbitration of the grievance even though the subject matter of the grievance is one within the jurisdiction of the Board.[16]

By its refusal to issue a complaint, the Board merely determined the evidence based upon its investigation was insufficient to support a charge of a statutory violation. This ended its inquiry. It did not purport to consider or determine alleged violations of the parties' contract.[17]

Finally, the fifteen strikers, entirely apart from their statutory right not to be discharged for engaging in protected activity, had a contractual right not to be discharged absent "just cause." [18] The

14. 29 U.S.C. § 158(a) (1), (3).

15. Cf. International Union of Elec., Radio and Machine Workers, A.F.L.-C.I.O. v. General Elec. Co., 332 F.2d 485, 492–93 (2d Cir.), cert. denied, 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964).

16. See Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

17. Cf. NLRB v. George E. Light Boat Storage, Inc., 373 F.2d 762, 767 (5th Cir. 1967) ; United Steelworkers of America v. American Int'l Aluminum Corp., 334 F.2d 147 (5th Cir. 1964), cert. denied, 379 U.S. 991, 85 S.Ct. 702, 13 L.

Ed.2d 611 (1965) ; International Union of Elec., Radio and Machine Workers, A.F.L.-C.I.O. v. General Elec. Co., 332 F.2d 485, 492 (2d Cir.), cert. denied, 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964).

18. See United Steelworkers of America v. American Int'l Aluminum Corp., 334 F.2d 147 (5th Cir. 1964), cert. denied, 379 U.S. 991, 85 S.Ct. 702, 13 L.Ed.2d 611 (1965) ; Lodge No. 12, Dist. No. 37, Int'l Ass'n of Machinists v. Cameron Iron Works, Inc., 257 F.2d 467 (5th Cir.), cert. denied, 358 U.S. 880, 79 S. Ct. 120, 3 L.Ed.2d 110 (1958) ; Package & Utility Drivers, Local 396, Int'l Bhd.

contract is very specific on the arbitrability of this issue as a matter of right. It not only provides (Article XV 1(b)) that a disciplinary penalty (including discharge) alleged to have been imposed without just cause is arbitrable, but also defines the scope of the arbitrator's review with respect to such claims. Thus, Article XV 1 further provides that " * * * the standard to be applied by an arbitrator to cases involving disciplinary penalties (including discharge) is that such penalties shall be imposed only for just cause."

To deny arbitration of this grievance would have the effect of depriving its employees of access to the contractually agreed upon forum for resolution of issues that have not as yet been passed upon by any other authorized body.

Under the circumstances, this court holds the grievance arbitrable.

of Teamsters, etc., v. Hearst Publishing Co., 206 F.Supp. 594 (S.D.Cal.1962). See also Glass Bottle Blowers Ass'n of the United States and Canada, A.F.L. C.I.O., v. Arkansas Glass Container Corp., 183 F.Supp. 829 (E.D.Ark.1960).