918 A.2d 579

BOARD OF EDUCATION OF THE BOROUGH OF ALPHA, WAR-
REN COUNTY, PLAINTIFF–RESPONDENT, v. ALPHA ED-
UCATION ASSOCIATION, DEFENDANT–APPELLANT.

Argued September 11, 2006—Decided December 21, 2006.

36

*Gail Oxfeld Kanef*, Newark, argued the cause for appellant (*Oxfeld Cohen*, attorneys; *Ms. Kanef* and *Sanford R. Oxfeld*, on the brief).

*Richard H. Bauch*, argued the cause for respondent (*Schenck, Price, Smith & King*, attorneys).

Justice WALLACE, JR. delivered the opinion of the Court.

The issue in this case is whether the arbitrator exceeded his authority in applying the continuing violation doctrine to conclude that plaintiff, the Alpha Board of Education (Board), improperly denied health insurance benefits to certain part-time employees. At some point, the Board discontinued providing health insurance coverage to employees who worked over twenty hours per week but were less than full-time employees. Although the collective negotiations agreement provided that a grievance must be filed within seven school days, defendant, the Alpha Education Association (Association), did not file a grievance until more than two years after the Board discontinued providing the benefits. The arbitrator found that the grievance was not timely filed, but sustained it because there was a continuing violation. The arbitrator ordered the Board to provide health insurance coverage to less than full-time employees working twenty hours or more as soon as feasible. The Chancery Division confirmed the award, but the Appellate Division reversed, reasoning that the arbitrator

exceeded his authority in applying the continuing violation doctrine. We granted certification, 185 *N.J.* 596, 889 *A.*2d 443 (2005), and now reverse.

I.

The facts are not in dispute. The Board is a public school board of education and a public employer under the New Jersey Employer–Employee Relations Act. *N.J.S.A.* 34:13A–1 to –30. The Association is a public employee representative under the Act and is the exclusive employment negotiator for all certified personnel employed by the Board, including elementary school teachers, special education teachers, and school nurses, but excluding substitute teachers, teaching-principals, and the administrative principal. The Board and the Association entered into collective negotiations agreements to govern their relationship over the years. The collective negotiations agreement (Agreement) at issue in this matter ran from September 1, 2000 through August 31, 2002.

Article 3 of the Agreement provided for grievance procedures, and promulgated various timeframes for the filing of a grievance and an appeal. Pursuant to the Agreement, a grievance must be initially reported within seven school days, and if not resolved to the satisfaction of the grievant, the grievant may appeal. The timeframes governing the appeals process, depending on the level of the grievance, ranged from five to ten days. The relevant portions of the Agreement provided as follows:

III. ARTICLE 3: GRIEVANCE PROCEDURE

. . . .

C. Procedure

1. Since it is important that grievances be processed as rapidly as possible, the number of days indicated at each level shall be considered as a maximum and every effort should be made to expedite the process. The time limits specified may, however, be extended by mutual agreement.

. . . .

4. *Level 1:* A teacher [1] with a grievance shall within seven (7) school days, first discuss it with the administrative principal (or immediate superior) with the objective of resolving the matter informally. Within five (5) school days after the date of the discussion, the administrative principal (or immediate superior) shall orally make known their decision to the employee.

---

[1] Article 1(B) of the Agreement provides that "[u]nless otherwise indicated, the term 'teachers' when used [in the Agreement], shall refer to all the professional

5. *Level 2:* If the aggrieved person is not satisfied with the disposition at Level 1, he may file the grievance in writing with the Chairman of the Association's Committee on Professional Rights and Responsibilities (hereinafter referred to as the "PR&R Committee") within five (5) school days. Within five (5) school days after receiving the written grievance the PR&R Committee shall present a written statement of its position on the matter to the administrative principal (or immediate superior) and to the aggrieved. If further discussion is necessary, the administrative principle (or immediate superior) shall hold a meeting upon request of the PR&R Committee and render a written decision within five (5) school days of the receipt of the written statement from the PR&R Committee.

. . . .

6. *Level 3:* If the aggrieved person is not satisfied with the disposition of this grievance at Level 2, he may request a review by the Board of Education. . . . The Board shall review the case, shall hold a hearing with the employee if requested by the employee, and shall render a decision in writing within thirty (30) days of receipt of the grievance.

7. Level 4:

a. A grievance which remains unresolved to the satisfaction of the aggrieved after a decision has been rendered by the Board may be submitted to arbitration within ten (10) calendar days following receipt of the Board's decision by the PR&R Committee upon the written request of the aggrieved, provided the PR&R Committee determines that the grievance is meritorious.

. . . .

VIII. ARTICLE 8: INSURANCE PROTECTION

A. As of the beginning of the 2000–2002 school year, the Board shall provide the health-care insurance protection designated below. The Board shall pay the full premium for each teacher.

1. The health-care program shall be provided by the Board. Any change in carriers which would alter the level of benefits would be mutually agreed upon by both the Board and the Association.

. . . .

4. Part-time employees shall be compensated according to the following schedule:

a. 2/5 time employee $275.00
 1/2 time employee $325.00
 3/5 time employee $375.00 [2]

employees represented by the Association in the negotiating unit as above defined[.]"

[2] The Association presented evidence to show that since the 1986–1988 contract, a work week consisted of 32½ hours (3/5 time corresponds to 19½ hours a week, ½ time corresponds to 16 hours, 15 minutes a week, and 2/5 time corresponds to 13 hours a week).

Until May 1996, the Board was enrolled in the State Health Benefits plan. Pursuant to that plan, all employees who worked at least twenty hours per week were provided benefits, and the Board paid the health insurance premiums. In January 1996, the State Health Benefits plan revised its rules to permit employers to establish minimum work hours per week that an employee must work to qualify for paid health insurance coverage. The Board then approved a resolution increasing the minimum work hours per week from twenty hours to thirty-two hours for employees to qualify for paid coverage under the State Health Benefits plan. The Association objected to the changes approved in the resolution. On May 16, 1996, the Board amended the resolution to exclude certified, professional, and contractual teaching staff from the thirty-two hour work requirement for benefits.

During that period, the parties were in negotiations for the 1997–2000 contract period. There was no reference to the elimination of health insurance benefits for part-time employees during those negotiations. Similarly, according to the president of the Association, there was no mention of the loss of insurance benefits for part-time employees in the negotiations for the subject Agreement for the 2000–2002 contract.[3]

In the fall of 2001, Cheryl McCann, a special education teacher, complained to the president of the Association that she worked a minimum of twenty hours per week, but her health insurance was not paid by the Board. Because the negotiations for the next contract period were about to commence in November 2001, the Association decided to raise the issue in those negotiations.

During negotiations, the parties were unable to resolve the issue. As a result, on December 20, 2002, the Association filed a

---

[3] The arbitrator noted that there was no evidence that the Board employed any part-time personnel who worked twenty hours or more from 1997 through 1999.

grievance on behalf of part-time professional employees working twenty hours or more who were not currently receiving paid health insurance benefits. The Association sought to have the Board adhere to the past practice of providing full benefits for part-time employees working twenty hours or more. The Association requested that those employees begin receiving benefits immediately, and that employees who had been denied coverage should be reimbursed for out-of-pocket expenses. The grievance was not resolved and it proceeded through the grievance procedure. On March 24, 2003, the Association notified the Board that it would proceed to arbitration.

The parties reached a tentative agreement on the 2002–2004 contract in July 2003, but the agreement did not resolve the issue of paid insurance benefits for part-time employees. The parties expressly agreed that the new contract would not impact the upcoming arbitration of the part-time health benefits grievance and that neither party admitted any liability regarding that grievance.

The parties mutually selected Edmund Gerber to preside over the arbitration. The arbitrator framed the issues as follows:

1.) Was the grievance timely filed? If not, should the grievance be dismissed?
2.) If the grievance is not dismissed pursuant to question one, [d]id the Board of Education violate Article VIII and past practice when it denied fully paid health insurance to certificated staff working twenty hours or more? If so, what is the remedy?

After reviewing the procedural history and the evidence presented, the arbitrator found that although the grievance should have been filed much earlier than December 2002, it would not dismiss the grievance for untimeliness because the grievance constituted a continuing violation. The arbitrator found nothing in the record to demonstrate any intent of the parties in negotiating the contract to exclude employees working twenty hours or more from paid health insurance benefits. He concluded that based on the past practice of the parties, the Board was obligated to provide health insurance benefits to part-time employees working twenty

hours or more, and that by eliminating that benefit without notice and without negotiating a change in the Agreement, the Board effectively "abnegated a term of the contract." Further, he explained that "[s]uch a harm, if true, would continue and potentially would effect.[sic] new and or different employees for the life of the contract."

The arbitrator declined the Association's request to apply the award retroactively, and instead, ordered a prospective award, finding that the Association's "failure ... to promptly file a grievance in this matter should not work a financial hardship on the Board." The arbitrator further ordered that the Board "shall provide health insurance at Board expense to all certificated staff working twenty hours or more as soon as feasible." At the time of the arbitrator's decision, there were two employees employed by the Board in that category.

The Chancery Division confirmed the award, and the Board appealed to the Appellate Division. The panel found that the Agreement provided specific timeframes for filing grievances, and that the Association could not escape the enforceability of clear contractual terms simply because its strategy to address the issue in collective negotiations failed. The panel rejected the application of the continuing violation doctrine, citing *North Plainfield Education Ass'n v. Board of Education,* 96 *N.J.* 587, 476 *A.*2d 1245 (1984). Because the issue was decided on procedural grounds, the panel did not address the arbitrator's finding that the Board was obligated to provide health insurance coverage to parttime employees who work twenty hours or more.

## II.

Before considering the central issue in this appeal, we state some general principles. Arbitration is a favored means of resolving labor disputes. *State v. Int'l Fed'n of Prof'l & Technical Eng'rs, Local 195,* 169 *N.J.* 505, 513, 780 *A.*2d 525 (2001) (citing *County Coll. of Morris Staff Ass'n v. County Coll. of Morris,* 100 *N.J.* 383, 390, 495 *A.*2d 865 (1985)); *Scotch Plains–Fanwood Bd.*

*of Educ. v. Scotch Plains–Fanwood Educ. Ass'n,* 139 *N.J.* 141, 149, 651 *A.*2d 1018 (1995). The aim of arbitration is to provide the final disposition of a dispute in a speedy and inexpensive manner. *Barcon Assocs., Inc. v. Tri–County Asphalt Corp.,* 86 *N.J.* 179, 187, 430 *A.*2d 214 (1981). Accordingly, judicial review of an arbitrator's decision is very limited, and the arbitrator's decision is not to be cast aside lightly. *Ibid.* "In the public sector, the scope of review in matters of interpretation is confined to determining whether the interpretation of the contractual language is reasonably debatable." *County Coll. of Morris Staff Ass'n, supra,* 100 *N.J.* at 390–91, 495 *A.*2d 865.

■ To be sure, there are limitations to the deference a court must give to an arbitrator's decision. The New Jersey Arbitration Act, *N.J.S.A.* 2A:24–1 to –11, provides that a reviewing court shall vacate an arbitration award only:

a. Where the award was procured by corruption, fraud or undue means;

b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;

c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;

d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

[*N.J.S.A.* 2A:24–8.]

"A court also may vacate an award if it is contrary to existing law or public policy." *Int'l Fed'n of Prof'l & Technical Eng'rs, supra,* 169 *N.J.* at 514, 780 *A.*2d 525 (citing *Office of Employee Relations v. Commc'ns Workers,* 154 *N.J.* 98, 112, 711 *A.*2d 300 (1998)).

■ In some instances, the Court's responsibility to decide the issue of arbitrability depends on whether it is an issue of substantive arbitrability or procedural arbitrability. Substantive arbitrability refers to "whether the particular grievance is within the scope of the arbitration clause specifying what the parties have agreed to arbitrate." *Standard Motor Freight, Inc. v. Local Union No. 560, Int'l Brotherhood of Teamsters,* 49 *N.J.* 83, 96, 228

*A.*2d 329 (1967). Issues of substantive arbitrability are generally decided by the court. *Ibid.* Procedural arbitrability refers to whether a party has met the procedural conditions for arbitration. *Id.* at 97, 228 *A.*2d 329. Matters of procedural arbitrability "should be left to the arbitrator." *Ibid.* (citing *John Wiley & Sons, Inc. v. Livingston,* 376 *U.S.* 543, 557, 84 *S.Ct.* 909, 918, 11 *L.Ed.*2d 898, 909 (1964)).

■ In the present case, the parties do not dispute that the issue of whether employees working twenty hours or more were entitled to receive fully paid health insurance benefits was within the scope of the arbitration clause. Thus, substantive arbitrability is not disputed. The contested issue here is one of procedural arbitrability; whether the Association met the procedural conditions in the Agreement for filing a timely grievance. As noted, if a matter is one of procedural arbitrability, a court must afford deference to the judgment of the arbitrator's decision so long as it is "reasonably debatable." *Int'l Fed'n of Prof'l & Technical Eng'rs, supra,* 169 *N.J.* at 514, 780 *A.*2d 525.

### III.

We turn now to apply those tenets to the arbitrator's decision. Specifically, we must determine whether the arbitrator's decision to apply the continuing violation doctrine in this case was "reasonably debatable."

■ The continuing violation doctrine recognizes that there are violations of a collective negotiations agreement that by their nature may be recurring. Thus, when an agreement is consistently being violated, it would be inappropriate to apply the strict time limitations in the agreement for the filing of a grievance of an ongoing contractual right.

Several standard texts on arbitration have described the continuing violation doctrine.

Many arbitrators have held that "continuing" violations of the agreement (as opposed to a single isolated and completed transaction) give rise to "continuing"

grievances in the sense that the act complained of may be said to be repeated from day to day—each day there is a new "occurrence"; these arbitrators have permitted the filing of such grievances at any time, this not being deemed a violation of the specific time limits stated in the agreement. . . . For example, where the agreement provided for filing "within ten working days of the occurrence," it was held that where employees were erroneously denied work, each day lost was to be considered a new "occurrence" and that a grievance presented within 10 working days of any such day lost would be timely.

[Frank Elkouri & Edna A. Elkouri, *How Arbitration Works* 281–82 (Marlin M. Volz & Edward P. Goggin eds., 5th ed. 1997) (footnotes omitted).]

In *Fairweather's Practice and Procedure in Labor Arbitration* (Ray J. Schoonhoven ed., 3d ed. 1990), cited by this Court as a "recognized treatise" in *International Federation of Professional & Technical Engineers, supra,* 169 *N.J.* at 521, 780 *A.*2d 525, the continuing violation doctrine is discussed as follows:

If the grievant continues to suffer from the alleged contract violation, the arbitrator may find that the violation is a continuing one. In such a case, the limitations period recommences each day; hence, the time for filing the grievance is extended. For example, a company's failure to discharge an employee who does not join a union within 31 days is never barred because the failure constitutes a "continuing violation." The "continuing violation" doctrine is used most frequently by grievants seeking damages because an employer failed to pay the established wage rate for the employee's classification or failed to grant a merit increase. Recently, arbitrators have applied continuing violation theory in a number of other contexts.

[Schoonhoven, *supra,* at 86 (footnotes omitted).]

Although this Court has not previously approved the application of the continuing violation doctrine to a grievance as presented here, our Appellate Division and other courts have. In *Board of Education of the Buena Regional School District v. Buena Regional Education Ass'n,* 300 *N.J.Super.* 415, 693 *A.*2d 159 (App. Div.), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 879 (1997), the panel rejected the board's argument that the association failed to file its grievance within the time limits of the agreement. The panel explained that it was the responsibility of the arbitrator to determine whether the grievance was timely filed, and "the [b]oard has not shown any grounds for disturbing the arbitrator's determination that the grievance was timely because it was directed at a 'continuing violation.'" *Id.* at 424, 693 *A.*2d 159.

Federal courts have similarly deferred to the arbitrator's findings concerning the applicability of the continuing violation doctrine in determining the timeliness of a grievance. *See, e.g., D.E.I., Inc. v. Ohio & Vicinity Reg'l Council of Carpenters*, 155 *Fed.Appx.* 164, 172 (6th Cir.2005) ("The continuing violation theory, 'well established in both arbitral and judicial precedents,' is a plausible explanation for why the panel did not find the grievance to be untimely.") (citation omitted); *Agipcoal USA, Inc. v. Int'l Union, UMWA*, 877 F.2d 62, *5 (6th Cir.1989) ("The arbitrator in the present case was, in our opinion, 'arguably' construing and applying the contract. The arbitrator did not ignore the 10–day provision of the bargaining agreement, but attempted to apply it in conjunction with a 'continuing violation' concept that is well established in both arbitral and judicial precedents.").

We are convinced that the continuing violation doctrine that has been approved in our Appellate Division and in the federal courts is a viable doctrine to be applied by an arbitrator when appropriate. In the present case, the arbitrator found that despite the apparent lateness of the grievance, the Board's elimination of the health insurance benefit for part-time employees working twenty hours or more per week was a continuing violation that should be addressed and not dismissed as untimely. Essentially, the arbitrator concluded that each time the Board failed to provide health insurance benefits for those employees, that refusal was a separate and continuing violation. Therefore, the arbitrator concluded that the grievance should be decided and not dismissed on procedural grounds. Because the arbitrator made a reasonably debatable procedural decision, we are obliged to accept it.

The Appellate Division rejected the application of the continuing violation doctrine to this case. Citing *Shepherd v. Hunterdon Developmental Center*, 174 *N.J.* 1, 803 *A.*2d 611 (2002), the panel stated that the "doctrine is intended to ameliorate the harshness created by a strict application of the statute of limitations, in the context of employment discrimination cases alleging a hostile work environment, not to rescue defendant from the consequences of its

deliberate, ill-fated strategy." (citation omitted). The panel concluded that the continuing violation doctrine, as in *North Plainfield*, had no relevance to the present matter.

In *North Plainfield, supra*, two teachers earned master's degrees while on sabbatical leave during the second semester of the 1978–79 school year. 96 *N.J.* at 591, 476 *A.*2d 1245. After the teachers returned to the classroom in September 1979, each remained on the same salary step and did not receive credit for time spent on sabbatical for purposes of advancing along the salary scale. *Ibid.* The association filed a grievance on November 12, 1979 with the board, and the matter was arbitrated. *Ibid.* The arbitrator ruled in favor of the board, noting that the board had consistently denied credit for time spent on sabbatical and "the [a]ssociation unsuccessfully had attempted to amend the labor agreement in 1978 by adding a provision that a teacher on sabbatical 'shall not suffer loss of status on salary guide.' " *Ibid.* The teachers did not seek to modify the award. *Ibid.*

The next year, on September 29, 1980, the association filed a petition with the Commissioner seeking relief from the board's denial of·credit for time spent on sabbatical. *Id.* at 592, 476 *A.*2d 1245. The matter was subsequently transferred to the Office of Administrative Law. *Ibid.* The Administrative Law Judge eventually dismissed the petition as beyond the ninety-day period to challenge the board's decision under *N.J.A.C.* 6:24–1.2.[4] *Id.* at 594–95, 476 *A.*2d 1245. The Commissioner and the State Board of Education affirmed. *Id.* at 590, 476 *A.*2d 1245. The Appellate Division reversed, finding a "statutory right to credit on the salary scale without regard to performance and that the time bar of *N.J.A.C.* 6:24–1.2 could not affect that right." *Ibid.* This Court reversed the judgment of the Appellate Division. *Ibid.* Although we noted that "[i]f the annual increment were a statutory entitlement, ... the ninety-day period of limitations contained in *N.J.A.C.* 6:24–1.2 would not apply, and the petition for prospective

---

4 Effective April 3, 2000, Chapter 24 was recodified as *N.J.A.C.* 6A:3.

relief would have been timely[,]" we held it was "not a matter of statutory right," but one that was "subject to the time bar." *Id.* at 594, 476 *A.*2d 1245.

We find that *North Plainfield* differs from the present case in several ways. First, in rejecting the continuing violation claim, we observed that

[s]uch a claim, which is associated with the assertion of discrimination in employment, has no relevance to this case. Furthermore, the fact that the teachers will always lag one step behind is not attributable to a new violation each year, but to the effect of an earlier employment decision, one that is protected by the regulatory period of limitations.

[*Id.* at 595, 476 *A.*2d 1245.]

Thus, the nature of the violation was not continuous, but rather, it was an isolated decision. In the present case, however, each time the Board failed to provide paid health insurance benefits to a part-time employee working twenty hours or more, the Association claimed that such action was a separate violation of the Agreement. Second, in *North Plainfield,* prior to the teachers petitioning the Commissioner, the association had filed a grievance with the board claiming a violation for failing to advance the teachers returning from sabbatical to the next salary step. *Id.* at 591–92, 476 *A.*2d 1245. Based on past practice, the arbitrator found in favor of the board, and no appeal from that matter was filed. *Id.* at 591, 476 *A.*2d 1245. Thus, the substance of the association's grievance was decided by the arbitrator on the merits and the association lost. Third, the issue in *North Plainfield* was a discretionary statutory benefit and not a statutory entitlement. We expressly noted that if it had been a statutory entitlement, "the petition for prospective relief would have been timely." *Id.* at 594, 476 *A.*2d 1245. In the present case, we view the asserted contractual benefit in the Agreement as similar to a statutory entitlement that would permit a petition for prospective relief to be timely. Consequently, we conclude that our decision in *North Plainfield* does not control the outcome here.

The dissent disagrees with our interpretation of *North Plainfield,* and criticizes our decision for tacitly dismantling the holding

reached in *Camden Board of Education v. Alexander*, 181 *N.J.* 187, 854 *A.*2d 342 (2004), in which "we explained that 'we have not endorsed a presumption in favor of arbitrability for the public sector[, but that c]onversely, we expressly have approved such a presumption for private-sector bargaining.' " *Post* at 54, 918 *A.*2d at 591. The dissent, however, fails to note that the Legislature overruled the above conclusion when it amended *N.J.S.A.* 34:13A–5.3, effective January 12, 2006, to provide that "[i]n interpreting the meaning and extent of a provision of a collective negotiation agreement providing for grievance arbitration, a court or agency shall be bound by a presumption in favor of arbitration. Doubts as to the scope of an arbitration clause shall be resolved in favor of requiring arbitration."

## IV.

The Appellate Division vacated the award because it found the grievance was untimely. As noted, we disagree with that conclusion because it failed to recognize the validity of the continuing violation doctrine. Because the panel vacated the award on procedural grounds, it did not address whether the arbitrator's substantive decision on the health insurance coverage issue was reasonably debatable. Consequently, we remand that issue to the Appellate Division.

## V.

We reverse the judgment of the Appellate Division and remand for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, dissenting.

The majority defines "[t]he issue in this case [as] whether the arbitrator exceeded his authority in applying the continuing violation doctrine to conclude that plaintiff, the Alpha Board of Education (Board), improperly denied health insurance benefits to certain part-time employees." *Ante*, 190 *N.J.* at 36, 918 *A.*2d at 580 (2006). Acknowledging both that "the collective negotiations

agreement provided that a grievance must be filed within seven school days [and that] defendant, the Alpha Education Association (Association), did not file a grievance until more than two years after the Board discontinued providing the benefits[,]" *id.* at 36, 918 *A.*2d at 580,[1] the majority concurs with "[t]he arbitrator [who] found that the grievance was not timely filed, but sustained it because there was a continuing violation." *Ibid.*

To so conclude, the majority perforce ignores our recent and consistent holdings in respect of the applicability and reach of the "continuing violation" doctrine, as well as the scope of our duties in respect of public-sector collective negotiations agreements. Because the majority misapplies that doctrine, I respectfully dissent.

I.

A.

We have made clear that, under New Jersey law, the "continuing violation" doctrine is "an equitable exception to the statute of limitations[.]" *Shepherd v. Hunterdon Developmental Ctr.,* 174 *N.J.* 1, 6, 803 *A.*2d 611 (2002). As *Shepherd* explains, "[u]nder that doctrine, a plaintiff may pursue a claim ... if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period." *Id.* at 6–7, 803 *A.*2d 611 (citation omitted). Stated differently, a continuing violation "claim, by definition, is comprised of a pattern or series of acts connected for liability purposes by the fact 'that an act contributing to the claim occurs within the filing period.' " *Id.* at 24, 803 *A.*2d 611 (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 *U.S.* 101, 117, 122 *S.Ct.* 2061, 2074, 153 *L.Ed.*2d 106, 124 (2002)).

---

1 "Unlike private-sector employees, public employees are not given the right to 'bargain collectively.' Public employees instead may engage in collective negotiations." *Camden Bd. of Educ. v. Alexander,* 181 *N.J.* 187, 193–94, 854 *A.*2d 342 (2004) (citations omitted).

Our application of the continuing violation doctrine, however, has been limited to "the assertion of discrimination in employment[.]" *North Plainfield Educ. Ass'n v. Bd. of Educ. of the Borough of North Plainfield*, 96 *N.J.* 587, 595, 476 *A.*2d 1245 (1984). In the context of this case, and relying explicitly on *Shepherd*, the Appellate Division, in an unpublished per curiam decision, correctly held that "[t]he [continuing violation] doctrine is intended to ameliorate the harshness created by a strict application of the statute of limitations[ ] in the context of employment discrimination cases alleging a hostile work environment, not to rescue defendant from the consequences of its deliberate, ill-fated strategy." Therefore, because the claims asserted by the Association in the arbitration against the Board do not, on their face, allege employment discrimination, the continuing violation doctrine is inapplicable.

## B.

Seeking to justify its unprecedented extension of the continuing violation doctrine to the cause at issue between the Association and the Board, the majority takes great pains to distinguish what is, to me, clear, unequivocal, and binding precedent: *North Plainfield, supra,* 96 *N.J.* at 595, 476 *A.*2d 1245. In *North Plainfield,* two teachers who took semester-long sabbatical leaves were not advanced to their next pay grade when they returned from their sabbaticals. *Id.* at 591, 476 *A.*2d 1245. After the teachers returned to their teaching duties, the North Plainfield teachers' union filed a grievance alleging that the failure to advance those two teachers to their next pay grade while on sabbatical violated the collective negotiations agreement between the school board and the union. *Ibid.* Based on the school board's policy and practice of denying credit for salary advancement to teachers for time spent on sabbatical, the arbitrator sustained the school board's position; tellingly, "[t]he teachers neither denied knowledge of the [school board]'s practice nor sought to correct or modify the award." *Ibid.*

Undaunted, a year later both teachers petitioned for statutory in-service credit for their sabbaticals from the Commissioner of the Department of Education, seeking "[i]n essence ... prospective relief that would obviate the denial of credit for the time spent on sabbatical and would reverse the [school board]'s decision for future years." *Id.* at 592, 476 *A.2d* 1245. That petition was classified as a contested case and, thus, was transferred to the Office of Administrative Law for adjudication. *Ibid.* The Administrative Law Judge issued an initial decision dismissing the petition as time-barred, noting that a claim for an annual increment " 'must be filed within 90 days after receipt of the notice by the petitioner of the order, ruling or other action concerning which the hearing is requested.' " *Id.* at 594, 476 *A.2d* 1245 (quoting *N.J.A.C.* 6:24–1.2). The Commissioner adopted that initial decision as the final agency action, and the State Board of Education affirmed the decision of the Commissioner. *Id.* at 590, 476 *A.2d* 1245. The teachers appealed.

The Appellate Division reversed. Solely "focus[ing] on the timeliness of the filing of the petition," *id.* at 592, 476 *A.2d* 1245, we, in turn, "reverse[d] the judgment of the Appellate Division and reinstate[d] the decision of the State Board of Education." *Id.* at 595, 476 *A.2d* 1245. We specifically noted:

> Nor does the withholding of the increment constitute a continuing violation. Such a claim, which is associated with the assertion of discrimination in employment, has no relevance to this case. Furthermore, the fact that the teachers will always lag one step behind is not attributable to a new violation each year, but to the effect of an earlier employment decision, one that is protected by the regulatory period of limitations.
>
> [*Ibid.*]

## C.

As the Appellate Division aptly concluded, *North Plainfield* is indistinguishable from this case. As in *North Plainfield,* there was a limitations period applicable for the timeliness of claims: in *North Plainfield,* the limitations period was imposed by regulation, *id.* at 594, 476 *A.2d* 1245, while the limitations period here was contractually agreed to in the collective negotiations agree-

ment. Also, as in *North Plainfield*, whether the union members here were entitled to some benefit resulted from an isolated, single, and discrete determination by the school board: in *North Plainfield*, the claim arose as a result of the school board's refusal to credit the teachers for the period during which they were on sabbatical, *id.* at 591, 476 *A.*2d 1245, whereas the claim here arose as a result of an isolated, single and discrete determination that non-full-time staff members are not entitled to paid health benefits. Further, as in *North Plainfield*, the school board's decision was consistent with prior, long-standing policy. In short, there simply is no principled way to distinguish this case from *North Plainfield*. Thus, our conclusion, as the Appellate Division correctly saw it, is entirely free from doubt: the Association's grievance is time-barred.

## II.

In the end, what the majority seeks is to apply the continuing violation doctrine in the context of this labor arbitration. However, to reach that goal, the majority must overcome *North Plainfield's* clear and unambiguous import, and it must ignore the Association's unwillingness to place this issue where it squarely and properly belongs: on the bargaining table.

## A.

According to the majority, *North Plainfield* is distinguishable in three separate respects. I address—and reject—each such rationale in turn.

First, the majority acknowledges that, in *North Plainfield*, "the nature of the violation was not continuous, but rather, it was an isolated decision." *Ante*, at 47, 918 *A.*2d at 587. Yet, the majority fails to inform how the decision at issue here—the denial of paid health benefits to part-time workers—is in any way substantively different than the denial of a pay increment in *North Plainfield*. The reason for that failure is straightforward: there is no substantive difference between the two.

Second, the majority asserts that *North Plainfield* differs from this case because "the substance of the [teachers' union]'s grievance was decided by the arbitrator on the merits and the [teachers' union] lost." *Ibid.* That statement undoubtedly is correct; however, its accuracy is myopic. That statement ignores the fact that our decision in *North Plainfield* did not arise from the earlier arbitration—from which an appeal was never taken—but from the procedural limitations of a later petition filed by those teachers with the Commissioner of Education. *North Plainfield, supra,* 96 *N.J.* at 591–92, 476 *A.*2d 1245. If a fair and balanced apples-to-apples comparison is to be made, one must compare the decision of the Commissioner in *North Plainfield* to the arbitrator's decision in this case. That comparison yields far more parallels than the convenient yet inapposite arbitrator-to-arbitrator comparison suggested by the majority.

Third, the majority notes that "the issue [in *North Plainfield*] was a discretionary statutory benefit and not a statutory entitlement[,]" explaining that a different result would have been likely in the latter instance. *Ante,* at 47, 918 *A.*2d at 587. Again, the majority fails to inform how this constitutes a substantive difference from the case at hand. On the contrary, the collective negotiations agreement here mandated paid health benefits for full-time employees—akin to the statutory entitlement in *North Plainfield*—but left the Board free to determine whether to grant paid health benefits to part-time employees—much like the discretionary benefit in *North Plainfield.* In sum, *North Plainfield* is indistinguishable from this case. As the Appellate Division correctly acknowledged, *North Plainfield*'s holding must control here.

B.

At oral argument, we were informed that, despite the pendency of this appeal and despite intervening collective negotiations agreements between the Association and the Board,[2] the Associa-

---

[2] The collective negotiations agreement at issue in this case covered the period from September 1, 2000 to August 31, 2002. *Ante,* at 37, 918 *A.*2d at 580–81.

tion had not sought, as a matter of contract, paid health benefits for part-time employees. Under those circumstances, we should be loath to inject ourselves into the middle of what are properly matters for contract negotiation. For that reason, the decision of the majority is, to me, ill-advised. Instead, we are best guided by the injunction of *Camden Bd. of Educ. v. Alexander, supra,* 181 *N.J.* at 200–01, 854 *A.*2d 342: "In this public-sector employment dispute, a court should not deliver by fiat what was not obtained through negotiation." In the end, we should hew to our long-standing rule that "[t]he court will not write a new contract for the parties or vary, enlarge, alter or distort its terms for the benefit of one to the detriment of the other under the guise of judicial interpretation." *Standard Refinery Union, Inc. v. Esso Standard Oil Co.,* 31 *N.J.Super.* 548, 552, 107 *A.*2d 513 (App.Div.1954) (citations omitted).

Furthermore, the majority tacitly dismantles the core holding we reached but two years ago in *Camden Bd. of Educ. v. Alexander.* In that case, we explained that "we have not endorsed a presumption in favor of arbitrability for the public sector[, but that c]onversely, we expressly have approved such a presumption for private-sector bargaining." *Supra,* 181 *N.J.* at 203, 854 *A.*2d 342 (citation omitted). Instead, we endorsed the rationale of *Bd. of Educ. of the Twp. of Bloomfield v. Bloomfield Educ. Ass'n,* 251 *N.J.Super.* 379, 598 *A.*2d 518 (App.Div.1990), *aff'd o.b.,* 126 *N.J.* 300, 598 *A.*2d 517 (1991), and explained that, in a public-sector setting, the following four-step analysis obtains:

[1] The duty to arbitrate springs from contract, and the parties can only be compelled to arbitrate those matters which are within the scope of the arbitration clause of their contract. [2] When there is a dispute as to whether a grievance falls within the terms of the arbitration clause of the contract, it is the duty of the courts to determine whether the matter is arbitrable. [3] However, in determining whether a matter is arbitrable, the court is limited to ascertaining whether the

Assuming that the term of that agreement fairly represented the practice between these parties, there should have been at least three intervening collective negotiations agreements between the Board and the Association *before* this appeal was argued.

party seeking arbitration is making a claim which, on its face, is covered by the contract and within the arbitration clause. The court may not, in any way, pass upon the merits of the actual dispute. [4] If the arbitrator is found to have jurisdiction over a matter, the court must send it to arbitration, even though the court may think the dispute is patently frivolous.

[*Camden Bd. of Educ. v. Alexander, supra,* 181 *N.J.* at 204–05, 854 *A.*2d 342 (quoting *Bd. of Educ. of the Twp. of Bloomfield v. Bloomfield Educ. Ass'n, supra,* 251 *N.J.Super.* at 384, 598 *A.*2d 518 (citations omitted)).] [3]

An application of those principles here leads inescapably to the following conclusions: (1) that the limitations period expressly adopted in this collective negotiations agreement for the filing of a grievance defines the parties' obligation to arbitrate; (2) that, when presented with a dispute whether this grievance is arbitrable, that determination belongs to the courts, and not the arbitrator; (3) that the Association's grievance here was facially barred by the collective negotiations agreement; and (4) there is nothing to remand to an arbitrator for determination.

## III.

For the foregoing reasons, I would affirm the judgment of the Appellate Division and conclude that the Association's two-year unexplained delay in seeking arbitration is fatal to its claim. I, therefore, respectfully dissent.

*For reversal and remandment*—Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—5.

*For affirmance*—Justice RIVERA–SOTO—1.

---

[3] The majority relies heavily on the Legislature's later adoption of a statutory presumption of arbitrability in the public sector setting. *Ante* at 48, 918 *A.*2d at 587. I do not consider that factor relevant; although the Legislature changed the outcome reached in *Camden Bd. of Educ. v. Alexander, supra,* it did not affect the reasoning of that decision. It is upon that reasoning—and not the outcome—that I rely.