933 A.2d 596

NORTHVALE BOARD OF EDUCATION, PLAINTIFF–RESPONDENT v. NORTHVALE EDUCATION ASSOCIATION AND PATRICIA LENART, DEFENDANTS–APPELLANTS.

Argued October 30, 2006—Decided October 29, 2007.

*Gregory T. Syrek,* argued the cause for appellants (*Bucceri & Pincus,* attorneys).

*Stephen R. Fogarty,* argued the cause for respondent (*Fogarty & Hara,* attorneys; *Mr. Fogarty* and *Rodney T. Hara,* of counsel; *Mr. Fogarty, Jocelyn M. Frank* and *Janet L. Parmelee,* on the briefs).

*Steven R. Cohen,* argued the cause for *amicus curiae* New Jersey Education Association (*Selikoff & Cohen,* attorneys; *Mr. Cohen* and *Carol H. Alling,* on the brief).

*John J. Burns,* argued the cause for *amicus curiae* New Jersey School Boards Association (*Cynthia J. Jahn,* General Counsel, attorney).

PER CURIAM.

The members of the Court being equally divided, the judgment of the Appellate Division is affirmed.

Justice HOENS, concurring.

In November 2003, Patricia Lenart, a part-time teacher and part-time secretary at Northvale High School, was advised that the Superintendent of Schools had approved a recommendation to terminate her one-year employment contract in accordance with its sixty-day notice provision. Defendant Northvale Education Association filed a grievance on her behalf, which was denied by plaintiff Northvale Board of Education. When defendant attempted to submit the matter to arbitration, plaintiff filed a complaint in the Chancery Division. There, the court entered an order enjoining arbitration, which order was affirmed by the Appellate Division.

This matter requires us to consider circumstances we have left unanswered in our recent decisions relating to nontenured school employees whose employment rights are governed in part by individual contracts and in part by collectively negotiated agreements. In particular, we must address whether, although the individual employment contracts may be terminated on notice, and although such employees have no right to the renewal of their individual contracts, they nonetheless have a right to pursue grievance arbitration if their contracts are terminated in the middle of a contract term.

In our view, where the parties have not included any provision in the collective agreement that clearly vests an employee subject to an individual employment contract with a right to challenge a mid-term termination, on notice, of the contract through a grievance proceeding, the terms of the individual contract, otherwise in accordance with applicable statutory provisions, are enforceable as written.

I.

The facts are not in dispute. Plaintiff is a public school board of education and, therefore, a public employer within the meaning of the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –39 (the Act). Defendant is a public employee

representative under the Act, performing as "the exclusive and sole representative for collective negotiations concerning the terms and conditions of employment" for certain school employees, including teaching staff and secretaries.

## A.

Patricia Lenart is a union member whose rights are governed by the collective negotiations agreement (CNA) entered into by defendant. In October 2003, plaintiff hired Lenart to work as a part-time secretary for the school principal, Eugene Harris, and as a part-time social studies teacher. Because she was a nontenured employee, Lenart, in accordance with plaintiff's previously promulgated policy, signed an individual employment contract. That contract contained the following termination-on-notice provision:

The parties hereto covenant and agree that anything to the contrary notwithstanding this contract may at any time be terminated by either party giving to the other sixty (60) days notice in writing of intention to terminate the same, but in the absence of any such notification this contract shall run for the full term stated above.

Approximately one month after Lenart was hired, Harris and the Superintendent of Schools began receiving complaints from parents and students about her teaching abilities. At the same time, plaintiff began to receive complaints from parents, teachers, and other secretaries concerning Lenart's performance as a secretary. As a result, Harris met with Lenart on November 14, 2003, to discuss the complaints.

On November 21, 2003, Harris sat in and observed Lenart teach a social studies lesson. Subsequently, he completed a Teacher Observation Report form. Of the twenty-five [1] relevant evaluation criteria specified on that form, Harris rated Lenart "unsatisfactory" in sixteen areas and determined that she "need[ed] improvement" in seven other categories. Her work, therefore, was "satis-

---

[1] Although the evaluation form included twenty-six categories of performance, one was not applicable.

factory" in only two of the twenty-five categories assessed. Among other deficiencies, Harris noted that Lenart was not aware that he was even present in the classroom for the first twelve minutes of the class because she was "seated with her back to the class doing her own work." He also observed that Lenart did not begin the day's lesson until more than half of the class period had elapsed, that she failed to use any "graphic instructional device[s]," had no lesson objective, and did not assign the students any homework.

That afternoon, Harris discussed his observations with Lenart and provided her with a "full verbal evaluation." In response, Lenart told him that she disagreed with his evaluation and thought that the class "went well." Harris immediately advised Lenart that he would recommend to the Superintendent that she be replaced. Three days later, on November 24, 2003, the Superintendent invoked the sixty-day termination-on-notice provision in Lenart's individual employment contract. Two days later, after plaintiff had approved the Superintendent's recommendation that Lenart's contract be terminated, the Superintendent notified Lenart that as of January 24, 2004, her employment would be terminated because of "serious deficiencies in [her] performance as a teacher and as a secretary."

Lenart was informed that during the sixty-day notice period, she would be able to continue to perform her duties as a secretary but that her teaching duties would be altered. Lenart objected to the change in her teaching assignment and was, as a result, essentially placed on paid leave pending the end of the notice period.

### B.

On January 20, 2004, defendant sent a notice to Harris that it was filing a grievance on Lenart's behalf. The grievance asserted that her termination was an improper disciplinary dismissal because the Board lacked "just cause" as required by the CNA. When Harris did not respond, defendant invoked the next stage of

the grievance process by sending its notice of the grievance to the Superintendent. Defendant again asserted that the termination was a disciplinary action without just cause.

After considering the grievance, the Superintendent declined to alter his original recommendation that Lenart should be terminated. In response, defendant pursued the matter by requesting that plaintiff conduct a grievance hearing. After doing so, and after deliberating, plaintiff decided not to reverse the termination decision. Subsequently, consistent with the CNA, defendant filed a request with the Public Employment Relations Commission (PERC) on April 20, 2004, for arbitration of the matter.

On November 17, 2004, plaintiff filed a verified complaint in the Chancery Division, seeking an order to show cause why arbitration should not be enjoined. Plaintiff argued that Lenart's grievance was not arbitrable because she had no contractual right or other entitlement to continued employment after the Board invoked the termination-on-notice provision of her individual employment contract. The PERC-assigned arbitrator adjourned the arbitration hearing pending resolution of plaintiff's complaint.

The Chancery Division judge granted plaintiff's application to restrain arbitration, finding that the CNA did not require plaintiff to afford nontenured employees terminated mid-contract the benefit of grievance procedures. Both defendant and Lenart appealed.

In an unpublished opinion, the Appellate Division affirmed, finding that the termination of Lenart's contract was neither a "discharge" nor a form of "discipline" under the CNA and therefore did not require either a showing of just cause or access to grievance procedures. The court found that "although the Board acted based on its determination that Lenart's performance ... was deficient, and afforded [her] the opportunity to be heard ..., it did not discharge her for inadequate performance but rather exercised a clearly enunciated contractual right to terminate [her individual employment agreement]."

The appellate panel further concluded that the termination-on-notice provision of the individual employment contract did not conflict with the just cause provision of the CNA, or diminish any of the rights that Agreement conferred. Rather, the panel found that plaintiff had the option of terminating an employee with notice, or discharging an employee without notice if just cause had been established. Using this reasoning, the panel found no conflict between the two agreements and concluded that Lenart had no right to arbitrate her termination.

We granted defendant's petition for certification, 186 *N.J.* 257, 893 *A.*2d 723 (2006), and thereafter granted leave to the New Jersey Education Association and the New Jersey School Boards Association to appear as amici curiae.

## II.

Our analysis of the issues raised in this matter must begin with a brief explanation of the statutory framework in which the parties have proceeded. We start, then, by noting that the Legislature has established the framework for employment rights of school personnel by enacting Title 18A. Included within that enactment are a number of provisions relating to rights of employees who are subject to employment contracts.

We have previously considered the relationship between the rights conferred by and protected under the CNA and the rights governed by individual employment contracts. *See Camden Bd. of Educ. v. Alexander,* 181 *N.J.* 187, 854 *A.*2d 342 (2004). In particular, we have addressed whether, absent specific language to the contrary in a CNA, a school board's decision not to renew individual contracts at the end of their ordinary terms could be arbitrable. *See id.* at 190, 854 *A.*2d 342.

As we have recognized, the traditional practice of offering separate, annual employment contracts to nontenured school employees is long-standing. *See Troy v. Rutgers,* 168 *N.J.* 354, 372–76, 774 *A.*2d 476 (2001) (discussing mutual operability of individual employment contracts and collective negotiations agreements);

*Mozier v. Bd. of Educ. of Cherry Hill,* 450 *F.Supp.* 742, 747–48 (D.N.J.1977). Indeed, Title 18A acknowledges this practice, through its reference to "nonrenewal" as permissible and through its creation of rights to be heard that are unlike grievance and arbitration rights. *See N.J.S.A.* 18A:27–4.1b. In *Camden, supra,* we rejected the assertion that a decision not to renew individual contracts at the end of their ordinary terms, although based on grounds that would also support imposition of discipline, is grievable. *See Camden,* 181 *N.J.* at 199, 854 *A.*2d 342. We there considered the specific language of the CNA, the language of the particular individual contracts, and the policies that support both collectively negotiated rights and individual contract rights. *Id.* at 196–201, 854 *A.*2d 342. In that context, we found no merit in the employees' argument that the decision not to renew the contracts, at the end of their term, was a pretext for discipline that gave rise to a grievance or an arbitration right. *See id.* at 201, 854 *A.*2d 342.

At the same time, however, the matter before us also raises questions relating more generally to labor arbitration. It therefore requires that we reiterate some of the general principles governing labor arbitration in the public school context. *See Bd. of Educ. of Borough of Alpha v. Alpha Educ. Ass'n,* 190 *N.J.* 34, 41–43, 918 *A.*2d 579 (2006). We have previously recognized the long-established principle [2] that "[a]rbitration is a favored means of resolving labor disputes." *Id.* at 41–42, 918 *A.*2d 579 (citing *State, Dept. of Corrections v. Int'l Fed'n of Prof'l & Technical Eng'rs, Local 195,* 169 *N.J.* 505, 513, 780 *A.*2d 525 (2001); *Scotch Plains–Fanwood Bd. of Educ. v. Scotch Plains–Fanwood Educ. Ass'n,* 139 *N.J.* 141, 149, 651 *A.*2d 1018 (1995)).

---

[2] In so noting, we commented that the Legislature's statutory response to this Court's earlier suggestion to the contrary in the public school setting, *see Camden, supra,* 181 *N.J.* at 203, 854 *A.*2d 342, resolved all doubts about the Legislature's preference for arbitration of labor disputes. *See Bd. of Educ. of Borough of Alpha, supra,* 190 *N.J.* at 48, 918 *A.*2d 579 (citing *N.J.S.A.* 34:13A–5.3).

Moreover, in *Alpha, supra,* we pointed out that because "[t]he aim of arbitration is to provide the final disposition of a dispute in a speedy and inexpensive manner[,] ... judicial review of an arbitrator's decision is very limited, and the arbitrator's decision is not to be cast aside lightly." *Id.* at 42, 918 *A.*2d 579 (citing *Barcon Assocs., Inc. v. Tri–County Asphalt Corp.,* 86 *N.J.* 179, 187, 430 *A.*2d 214 (1981)). While commenting that judicial review of arbitration decisions is limited, we noted that "[i]n the public sector, the scope of review in matters of interpretation is confined to determining whether the interpretation of the contractual language is reasonably debatable." *Ibid.* (quoting *County Coll. of Morris Staff Ass'n v. County Coll. of Morris,* 100 *N.J.* 383, 390–91, 495 *A.*2d 865 (1985)).

Nevertheless, we continued to reinforce our earlier holdings that, in determining whether a particular dispute is arbitrable, we will adhere to the traditional distinction between questions of substantive arbitrability, which are to be resolved by a court, and questions of procedural arbitrability, which generally fall within the scope of the arbitrator's authority. *Id.* at 42–43, 918 *A.*2d 579. In *Alpha, supra,* all parties agreed that the particular dispute fell within the scope of the arbitration clause, with the result that we would defer to the arbitrator's decision "so long as it is 'reasonably debatable.'" *Id.* at 43, 918 *A.*2d 579 (quoting *Int'l Fed'n of Prof'l & Technical Eng'rs, supra,* 169 *N.J.* at 514, 780 *A.*2d 525).

In this case, of course, the question is whether, in the first instance, the matter is within the scope of the CNA's arbitration provision at all. More to the point, in this case, we confront the question, left open in *Camden, supra,* of whether the termination of a contract in the middle of its term for reasons that might otherwise give rise to discipline falls within the provisions of the CNA.

With these considerations in mind, we turn to an explanation of the terms of the various agreements that inform our analysis.

### III.

Plaintiff and defendant entered into a collective negotiations agreement[3] for the period July 1, 2001 to June 30, 2004. The CNA includes several provisions that are relevant to this dispute. The first, found in Article III, reserves to plaintiff, in the first instance, a variety of rights relating to employees and their terms of employment. In particular, Article III provides as follows:

The Board reserves to itself sole jurisdiction and authority over matters of policy and retains the right, subject only to the limitations imposed by language of laws and regulations ... (b) to hire, promote, transfer, assign and retain employees in positions in the school district and to suspend, discharge or take other disciplinary action against employees; (c) to release employees from duty because of lack of work or for other legitimate reasons ... and (h) the aforementioned rights and authority shall be limited by the terms of the contractual relationship between the Board and the Northvale Education Association, past practice and applicable law.

In addition, however, the CNA affords rights to the employees, which include a limitation on discipline that plaintiff may impose. In particular, Article IV provides as follows:

B. Just Cause Provision—No employee shall be discharged, disciplined, reprimanded, [or] reduced in rank or compensation, without just cause. Any such action asserted by the Board, or any agent or representative thereof, shall be subject to the grievance procedure herein set forth.

Notwithstanding the breadth of that provision, however, the CNA specifically recognizes the existence and the enforceability of individual contracts of employment, providing in Article VII as follows:

A. An individual contract between the Board and an individual employee, heretofore or hereafter executed, shall be subject to and consistent with the terms and conditions of this Agreement. If an individual contract contains any language inconsistent with this Agreement, this Agreement during its duration shall be controlling.

---

[3] "In public sector labor relations in New Jersey, courts use the terms 'collective negotiation' and 'collective negotiations agreements' rather than 'collective bargaining' and 'collective bargaining agreements.'" *Troy, supra,* 168 *N.J.* at 359 n. 1, 774 A.2d 476 (citing *N.J. Tpk. Employees Union v. N.J. Tpk. Auth.,* 64 *N.J.* 579, 581, 319 A.2d 224 (1974)); *see also Lullo v. Int'l Ass'n of Fire Fighters, Local 1066,* 55 *N.J.* 409, 436–41, 262 A.2d 681 (1970) (explaining differences among terms).

At the same time, as a part of its description of the process relating to grievances and arbitration in Article V, the CNA includes the following definition:

The term "grievance" means a complaint by any employee, group of employees or the Northvale Education Association over the application, interpretation or violation of a policy, agreement or administrative decision affecting the terms and conditions of employment of said employee or group of employees.

The term "grievance" and the procedure relative thereto shall not be deemed applicable in the case of the failure or refusal of the Board to renew the contract of a non-tenured employee.

Finally, Article XVI of the CNA includes an integration clause that provides as follows:

E. Closure

This Agreement represents and incorporates the complete and final understanding and settlement by the parties of all issues which were or could have been the subject of negotiations. During the term of this Agreement, neither party will be required to negotiate with respect to any such matter, whether or not covered by this Agreement, whether or not within the contemplation of either or both of the parties at the time they negotiated.

The CNA was not negotiated in a vacuum. Indeed, its reference to past practices makes plain that the parties were aware of and took into account existing policies promulgated by plaintiff. Those policies therefore must also bear on our analysis. In addition to the rights and responsibilities set forth in the CNA, we consider several of those policies to be relevant.

In September 1998, plaintiff adopted policies relating to contract employees. Policy 3124, for example, required all nontenured members of the teaching staff to sign an individual contract with "a term of not more than one year" and specified the matters to be included in such contracts. Similarly, Policy 4124 required that all other nontenured school employees sign an individual employment contract of like term, which was required to include particular provisions relevant to those employees.

Significant to our consideration of the issues before us, however, in September 1998, plaintiff also adopted specific policies relating to termination of those individual contracts of employment. Policy

3143, relating to nontenured members of the teaching staff, provides in relevant part as follows:

> The Board of Education will enter a contract with each nontenured teaching staff member providing, in part, for the termination of employment by either party on proper notice in accordance with Board Policy No. 3124.
>
> The Board may dismiss a nontenured teaching staff member when dismissal is in the best interest of the school district. Termination notice will be duly given in writing and will state the reason therefor.
>
> However, the Board reserves the right to terminate a nontenured employee without notice when sufficient cause warrants.
>
> The Board will determine whether to permit an employee to continue to perform services during the period between the giving of notice and the date of termination.

The language of the policy relating to nontenured members of the non-teaching support staff is both somewhat broader and more specific in scope. Policy 4140, setting forth the policy on termination of those employees, provides in relevant part as follows:

> The Board may terminate the employment of [a nontenured support staff member] for incompetency, immorality, unfitness for service, insubordination, reduction in force, or other good cause. Any notification of termination for cause will include a full statement of the reasons for the dismissal on notice duly given a nonprobationary employee.
>
> The Board may terminate an employment contract with a nontenured support staff member only upon the recommendation of the Superintendent ... The Board may temporarily suspend an employee with or without pay and without notice when his or her continued services may be inimical to the interests of pupils.

Because Lenart was employed both as a member of the nontenured teaching staff and as a nontenured support staff member, both of these policies must be considered in our analysis.

## IV.

It is only in light of the long-standing policies promulgated by plaintiff relating to its rights to terminate or dismiss employees subject to individual contracts that we can harmonize the provisions of those contracts with the CNA and, more important, with the statutory rights relating to school employees. For it is only by recognizing the significance of those pre-existing policies that the various expressions by the parties of rights and responsibilities can be understood.

First, nothing in the statutory pronouncements of the Legislature confers an arbitration right on an employee who is subject to an individual contract. On the contrary, the relevant statute draws a sharp distinction between nontenured members of the teaching staff who are not renewed and those who are discharged for cause. As to the latter, the local Board of Education is required to notify the State Board of Education "whenever a nontenured, certificated employee is dismissed for cause, and the State board shall maintain a list ... [of such employees] and the reason for the dismissal for cause." *N.J.S.A.* 18A:16-1.3. The statute continues by providing that should a person who is on that list seek employment with another school board, the information "shall" be revealed to the prospective employer. *Ibid.*

However, the statute specifically provides that nontenured members of the teaching staff whose contracts are simply not renewed shall not be included on the list. *Ibid.* Therefore, we can only conclude that the Legislature was both aware of the prevalence of contracts [4] for nontenured employees, and aware of the differences between a termination pursuant to the terms of such a contract and a termination for cause. Only the latter would require notification of the State Board and disclosure to potential future employers.

As we have previously held, our duty is to discern whether the parties negotiated about a term and came to an agreement on it or not. As we have observed, "[i]n this public-sector employment dispute, a court should not deliver by fiat what was not obtained through negotiation." *Camden, supra,* 181 *N.J.* at 200–01, 854 *A.*2d 342. In this regard, the CNA included several provisions that are directly relevant to our analysis. First, the CNA specifically reserved to plaintiff significant rights relating to hiring, promoting, transferring and retention of employees. Plaintiff

---

[4] There can be little doubt that the Legislature has long been aware of the use of these individual employment contracts. The relevant statute directs the Commissioner of Education to "prepare and distribute blank forms for such contracts." *N.J.S.A.* 18A:27–7.

specifically reserved its rights by reference to its policies, which themselves permit it to terminate any nontenured teaching staff member "when dismissal is in the best interest of the school district." The same provision of the CNA gave plaintiff broad rights relating to suspension or discharge of employees. At the same time, the CNA recognized the right of the plaintiff to enter into contracts of employment with employees otherwise covered by its terms,[5] and affords those contracts recognition to the extent not inconsistent with the provisions of the CNA.

Second, and a key distinction here, the CNA in issue also included a specific definition of the scope of the grievance remedy. In particular, the CNA defines grievance to mean a complaint by an employee, group of employees, or the Association, "over the application, interpretation, or violation of a policy, agreement or administrative decision affecting the terms and conditions of employment of said employee or group of employees." According to the CNA, moreover, the term "grievance" does not apply in the case of the Board's refusal to renew the contract of a nontenured employee. The narrow definition of what constitutes a grievance, however, in the context of the previously known policies promulgated by plaintiff concerning its right to terminate nontenured employees, makes it plain that the parties did not contemplate that the grievance procedure would apply to a termination of an individual employment contract in the middle of its term.

The language of the CNA limits the scope of matters subject to arbitration in a significant way. Indeed, the limitation is particularly important because "[t]he duty to arbitrate springs from contract, and the parties can only be compelled to arbitrate those matters which are within the scope of the arbitration clause of their contract." *Bd. of Educ. of Bloomfield v. Bloomfield Educ. Ass'n,* 251 *N.J.Super.* 379, 384, 598 *A.*2d 518 (App.Div.1990), *aff'd,*

---

[5] In light of the statutory provision affording tenure rights to teachers who have served three years and one day, *see N.J.S.A.* 18A:28–5, the separate contracts only related to nontenured teachers and others, including secretarial staff, covered by the CNA who do not enjoy tenure rights.

126 *N.J.* 300, 598 *A.2d* 517 (1991). The issue about whether plaintiff's decision to terminate Lenart's contract in accordance with the terms of her separate annual contract of employment was in reality a disciplinary action and therefore within the grievance and arbitration clause of the CNA was a matter of substantive arbitrability and thus was properly for the judge, and not the arbitrator, to decide.

Finally, however, although the individual contract permitted plaintiff to discharge Lenart on sixty days' notice without cause, we see no interference between that term of her contract and the CNA's just cause language.[6] In light of the significant disadvantage to her that would follow were she to grieve her dismissal without success and therefore be included in the registry of teaching staff dismissed for cause, the inclusion of a lengthy period of notice with pay, and the right to seek other opportunities with an essentially unblemished record is not without value to her.

We do not perceive any inconsistency between the provisions of the CNA regarding discipline and the provisions of the individual contracts of employment. Read in harmony, the CNA would permit discharge, based on an assertion of just cause, without any notice to the employee. The individual contract, on the other hand, would permit termination of the contract, without any assertion of cause, but only on sixty days' notice to the employee. In light of the historical context of plaintiff's clearly enunciated policies relating to individual contracts of employment, the provisions in the CNA that recognize those policies and the plaintiff's rights to terminate those contracts, the rather generous notice provision and the advantages it affords to a dismissed employee,

---

[6] We recognize that the 2005 amendment to *N.J.S.A.* 34:13A–5.3 requires that we apply a presumption in favor of arbitration when we are called upon to interpret the scope of a grievance provision in a CNA. The record here leaves us with no doubt, however, that the parties agreed that the mid-term use of an individual contract's termination clause would be within plaintiff's prerogative and thus that it falls outside of the scope of the arbitration provision.

we do not read into the CNA a further right for this employee than the ones already afforded.

Given the absence of a statutory right to arbitrate a mid-contract termination on notice, we conclude that school boards have the inherent power to terminate a nontenured employee pursuant to the notice terms of an individual employment contract without providing the employee a hearing or an opportunity to arbitrate. In this case, in light of the language in the CNA concerning the Board's power to terminate staff members, the incorporation of the Board's policies on termination of nontenured contract employees, and the narrow definition of what constitutes a grievance under the CNA, we conclude that the Board did not waive its right to terminate mid-term nontenured employees on notice without extending to them a grievance procedure. Instead, the language of the CNA makes plain that neither the Board nor the Association contemplated that a grievance procedure would apply to a termination of a contract in the middle of its term.

We cannot overlook the fact that these parties, in negotiating the CNA and in referring in particular to the existence and validity of the individual employment contracts, were well aware of the scope and meaning of those contracts. Were we to conclude that Lenart was entitled to grieve and to arbitrate the decision of plaintiff to terminate her individual employment contract, we would, in effect, be creating for her a contract better than the one defendant negotiated.

Justices LaVECCHIA and RIVERA–SOTO join in this opinion.

Justice LONG, dissenting.

Patricia Lenart suffered a mid-term termination of her employment because of her inadequate teaching performance, as documented by the school principal who communicated his findings to her. That for-cause termination was facially governed by the just-cause provision of the CNA which provides an arbitration remedy. Nevertheless, three of our colleagues have concluded that Lenart's individual contract, providing for discharge on 60 days notice,

trumps the CNA. I disagree. The only relevant issue is whether a fair reading of the CNA requires arbitration in these circumstances. If so, any contrary provision in the individual contract, however advantageous, must yield. *Troy v. Rutgers,* 168 *N.J.* 354, 378, 774 *A.*2d 476 (2001) (noting collective agreements prevail over individual agreements and, when there is conflict, individual agreements may not be enforced). That is the gravamen of Article IV of the CNA: "If an individual contract contains any language inconsistent with this Agreement, this Agreement during its duration shall be controlling." The reason is obvious. Collective agreements are designed "to supersede the possible terms of individual agreements of employers with terms which reflect the strength and bargaining power and serve the welfare of the group." *Lullo v. Int'l Ass'n of Fire Fighters,* 55 *N.J.* 409, 428, 262 *A.*2d 681 (1970). Thus, any approach that favors an individual contract over a conflicting CNA provision would undermine the goals of collective negotiations and cannot be countenanced.

More importantly, our law has undergone a sea-change that compels arbitration here. In *Camden Board of Education v. Alexander,* a majority of this Court held that, under then-existing legal principles, there was no presumption in favor of arbitration when determining the scope of arbitrability in public-employee contracts. 181 *N.J.* 187, 203, 854 *A.*2d 342 (2004). Since that time, the Legislature has dramatically amended the controlling statute—*N.J.S.A.* 34:13A–5.3—to provide for a presumption in favor of public sector arbitration. *See L.* 2005, c. 380, § 1 (effective Jan. 12, 2006). The statute now explicitly contains such a presumption:

> In interpreting the meaning and extent of a provision of a collective negotiation agreement providing for grievance arbitration, a court or agency *shall be bound* by a presumption in favor of arbitration. *Doubts as to the scope of an arbitration clause shall be resolved in favor of requiring arbitration.*
>
> [*N.J.S.A.* 34:13A–5.3 (emphasis added).]

That unequivocal command by our elected representatives requires that I break with our concurring colleagues in this case. This is precisely the situation contemplated by the words of the

statute. Yet, our three colleagues fail to suggest how the instant facts overcome the presumption by which we are bound. The most that can be said of their parsing of the CNA and the individual contract is that it is one interpretation, but not the only one. An equally, if not more persuasive argument can be advanced to the contrary: that the CNA was negotiated in the face of the pre-existing Board policies; that it provides grievance arbitration for disciplinary actions; that a specific exclusion was negotiated for end-of-term non-renewals; that no such exclusion for mid-term dismissals for cause was negotiated; and that therefore the grievance arbitration procedure was intended to apply.

At the very least, doubt has arisen regarding the scope of arbitrability; therefore, that doubt must be resolved in favor of arbitration. The statutory command could not be clearer. *N.J.S.A.* 34:13A–5.3. Accordingly, I would resolve the dispute over Lenart's mid-term contract termination by remanding the case for grievance arbitration.

Justices ALBIN and WALLACE join in this opinion.

*For affirmance*—Justices LaVECCHIA, RIVERA–SOTO, and HOENS—3.

*For reversal*—Justices LONG, ALBIN, and WALLACE—3.